CASE NO. 14-2507

IN THE

UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

ERIC POWELL,
*Defendant-Appellant.*

**On Appeal from the United States District Court
for the Eastern District of Michigan
Southern Division**

**DEFENDANT-APPELLANT'S BRIEF ON APPEAL**

Domnick J. Sorise
Attorney for Defendant-Appellant
645 Griswold, Suite 1717
Detroit, Michigan 48226
(313) 967-0100

ORAL ARGUMENT REQUESTED

**TABLE OF CONTENTS**

TABLE OF CASES, STATUTES, & AUTHORITIES . . . . . . . . . . . . . . . . . . . . iii

STATEMENT IN SUPPORT OF ORAL ARGUMENT . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION . . 2

STATEMENT OF ISSUES FOR REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

SUMMARY OF ARGUMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

ARGUMENT I . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

    THE TRIAL JUDGE ERRED IN DENYING DEFENDANT'S
    MOTION TO SUPPRESS CELLULAR TELEPHONE
    IDENTIFICATION AND LOCATION DATA.

    PEN REGISTER/TRAP AND TRACE . . . . . . . . . . . . . . . . . . . . . . . . . 18

    CELL-SITE/GPS WARRANTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

    WARRANT TRACKING DEVICES . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

ARGUMENT II . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

    THE ADMISSION OF EVIDENCE ACQUIRED BY POLE
    CAMERAS, AND EVIDENCE DERIVED THEREFROM, VIOLATED
    DEFENDANT'S FOURTH AMENDMENT RIGHTS.

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

CERTIFICATE OF COMPLIANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

ADDENDUM (DESIGNATION OF DISTRICT COURT DOCUMENTS) . . . . 59

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

# TABLE OF CASES, STATUTES, & AUTHORITIES

CASES                                                                    PAGE

Franks v. Delaware, 438 U.S. 154 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 25, 32

Illinois v. Krull, 480 U.S. 340 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

In re Application of U.S., 620 F3d 304 (3d Cir 2010) . . . . . . . . . . . . . . . . . . . 20

Rivera v. United States, 928 F2d 592 (2d Cir 1991) . . . . . . . . . . . . . . . . . . . . 25

Smith v. Maryland, 442 US 735 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

United States v. Anderson-Bagshaw, 509 Fed App 396 (6th Cir 2012) . . . . . 55, 56

United States v. 92 Buena Vista Avenue, 507 US 111 (1993) . . . . . . . . . . . . . . 31

United States v. Beauchamp, 659 F3d 560 (6th Cir 2011) . . . . . . . . . . . . . . . 42, 47

United States v. Bishop, 264 F3d 919 (9th Cir 2001) . . . . . . . . . . . . . . . . . . . . 32

United States v. Brown, 448 F3d 239 (3d Cir 2006) . . . . . . . . . . . . . . . . . . . . 47

United States v. Ceccolini, 435 US 268 (1978) . . . . . . . . . . . . . . . . . . . . . . . . 47

United States v. Cuevas-Sanchez, 821 F2d 248 (5th Cir 1987) . . . . . . . . . . . . . 56

United States v. Davis, 430 F3d 345 (6th Cir 2005) . . . . . . . . . . . . . . . . . . . . . 32

United States v. Dupree, 617 F3d 724 (3d Cir 2010) . . . . . . . . . . . . . . . . . . . . 47

United States v. Gross, 662 F3d 393 (6th Cir 2011) . . . . . . . . . . . . . . . . . 40, 43, 47

United States v. Johnson, 656 F3d 375 (6th Cir 2011) . . . . . . . . . . . . . . . . . . 15, 49

United States v. Jones, ____ US ___, 132 SCt 945 (2012) . . . . . . . . . . . . . . 36, 54

<u>United</u> <u>States</u> <u>v.</u> <u>Leon</u>, 468 US 897 (1984) . . . . . . . . . . . . . . . . . . . . . . 28, 29, 30, 32

<u>United</u> <u>States</u> <u>v.</u> <u>Lopez-Arias</u>, 344 F3d  623 (6th Cir 2003) . . . . . . . . . . . . . . . . 43

<u>United</u> <u>States</u> <u>v.</u> <u>Page</u>, 232 F3d 536 (6th Cir 2000) . . . . . . . . . . . . . . . . . . . . . 23

<u>United</u> <u>States</u> <u>v.</u> <u>Reilly</u>, 76 F3d 1271 (2d Cir 1996) . . . . . . . . . . . . . . . . . . . . 32

<u>United</u> <u>States</u> <u>v.</u> <u>Shaw</u>, 464 F3d 615 (6th Cir 2006) . . . . . . . . . . . . . . . . . . . . . 47

<u>United</u> <u>States</u> <u>v.</u> <u>Skinner</u>,  690 F3d 772 (6th Cir 2012) . . . . . . . . . . . . . . . . 23, 27

<u>United</u> <u>States</u> <u>v.</u> <u>Warshak</u>, 631 F3d 266 (6th Cir 2010) . . . . . . . . . . . . . . . . . . . . 34

<u>United</u> <u>States</u> <u>v.</u> <u>Washington</u>, 797 F2d 1461 (9th Cir 1986) . . . . . . . . . . . . . . . . 31

<u>United</u> <u>States</u> <u>v.</u> <u>Williams</u>, 641 F3d 758 (6th Cir 2011) . . . . . . . . . . . . . . . . . . . . 27

<u>Wong</u> <u>Sun</u> <u>v.</u> <u>United</u> <u>States</u>, 371 US 471 (1963) . . . . . . . . . . . . . . . . . . . . . . 30, 45

STATUTES, COURT RULES, AND OTHER AUTHORITIES

18 USC §2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

18 USC §1291 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

18 USC §1956(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

18 USC §1956(h) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

18 USC §2703 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

18 USC §3121 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

18 USC §3122(b)2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

18 USC §3123 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

18 USC §3127 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 21

18 USC §3231 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

21 USC §841(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

21 USC §841(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

21 USC §846 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

28 USC §1291 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

47 USC §1001 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

47 USC §1002(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

FRAP Rule 34a . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

FRAP Rule 32(a)(7)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

FRCP Rule 41 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Sixth Circuit Rule 34 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

# STATEMENT IN SUPPORT OF ORAL ARGUMENT

Oral argument is requested pursuant to FRAP Rule 34a and Sixth Circuit Rule 34, because the facts and issues are complex enough to require oral argument in order to properly present the case for review.

## STATEMENT OF SUBJECT MATTER
## AND APPELLATE JURISDICTION

The indictment in this case charged Eric Powell with offenses against the United States, defined in Titles 18 and 21, United States Code. The district court had subject matter jurisdiction under 18 USC § 3231. Defendant appeals from the final judgment which disposed of all claims in this appeal. The judgment and commitment order, which completed the proceedings in the district court, was entered on November 10, 2014, and Notice of Appeal was timely filed on November 14, 2014. This Court is vested with appellate jurisdiction under 28 USC § 1291.

**STATEMENT OF ISSUES FOR REVIEW**

I.    WHETHER THE TRIAL JUDGE ERRED IN DENYING DEFENDANT'S MOTION TO SUPPRESS CELLULAR TELEPHONE IDENTIFICATION AND LOCATION DATA?

II.    WHETHER THE ADMISSION OF EVIDENCE ACQUIRED BY POLE CAMERAS, AND EVIDENCE DERIVED THEREFROM, VIOLATED DEFENDANT'S FOURTH AMENDMENT RIGHTS?

**STATEMENT OF THE CASE**

Eric Powell was charged by an Indictment on February 1, 2012, and then by a Superseding Indictment on January 15, 2013, in the United States District Court for the Eastern District of Michigan. On April 28, 2014, the government moved to dismiss Counts 11, 12, 13, and 14 against Defendant and two Co-Defendant's, and an Order was not entered until May 26, 2014, (RE 300, 356, Motion/Order, Pg ID 2377-2379, 2746-2747). On May 12, 2014, Eric Powell was convicted by a jury, before Senior United States District Judge Stephen J. Murphy, III, of Conspiracy to Distribute Marijuana, five Kilograms or more of Cocaine, one Kilograms or more of Heroin in Count 1, in violation of 21 USC §§ 846, 841(a)(1), 841(b)(1)(A)(i), (b)(1)(A)(ii), and (D); Possession with intent to Distribute one Kilogram or more of Heroin, Aiding and Abetting in Count 2, in violation of 21 USC §§ 841(a)(1), (b)(1)(A)(I); 18 USC § 2; Possession with intent to Distribute five Kilograms or more of Cocaine, Aiding and Abetting, in Count 3, in violation of 21 USC §§ 841(a)(1), (b)(1)(A)(ii)(II); 18 USC § 2; and Conspiracy to Launder Monetary Instruments in Count 10, in violation of 18 USC § 1956 (a)(1)(A)(I), (B)(i), (ii); 1956(h); 21 USC 841(b)(1)(A). The jury found that Count 1 involved more than one kilogram or more of heroin, and five kilograms or more of cocaine; that Count 2 involved one kilogram or more of heroin; and that Count 3 involved five kilograms or more of cocaine.

4

On October 17, 2014, Eric Powell was sentenced to concurrent terms of life imprisonment on all four counts, along with five years of supervised release on each count, and ordered to pay $400.00 in Special Assessment fees. On November 10, 2014, a Judgment and Commitment Order incorporating that sentence was filed in the District Court (RE 473), and a timely Notice of Appeal from the judgment of conviction and sentence was filed on November 14, 2014 (RE 474).

**STATEMENT OF FACTS**

As indicated by opening statement, the government's case focused on "a discrete six-month period" that involved "six key events" (RE 491, Transcript, Pg ID 4236). Five of the six events involved physical searches and seizures - - four after traffic stops of motor vehicles, and one for the execution of search warrants at nine properties (*Id* at Pg ID 4237-4246). The remaining event involved surveillance of various activities, part of which were video recorded by a pole camera, and shown during trial (*Id* at Pg ID 4241-4242). Case Agent Edward Donovan of the DEA, who took the stand three times during trial (RE 491, Transcript, 2419; RE 493, Transcript Pg ID 4548; RE 496, Transcript Pg ID 5014), testified about all six events. He was also the only witness to testify at pretrial suppression hearings held on January 17, and February 13, 2013 (RE 176, Pg ID 1393-1457; RE 296, Pg ID 2253-2314).

The first event occurred on June 23, 2010, and involved a traffic stop of Benny Whigham's vehicle (a Volkswagen) by Michigan State Police (MSP), on an interstate highway near Ann Arbor (RE 491, Transcript, Pg ID 4274-4276). The stop resulted in a search and seizure of a suitcase containing about ten kilos of heroin (*Id* at Pg ID 4288-4291). As indicated by evidentiary hearing testimony, Agent Donovan had attached a GPS tracking device to Defendant's Chevrolet Silverado truck on June 10, 2010, had found a pattern of short-duration trips to Chicago, and had located

Defendant's truck there by the tracker on June 22, 2010 (RE 296, Transcript, PG ID 2253-2263).

Agent Donovan's trial testimony indicated that he alerted Chicago DEA to Defendant's location, and requested surveillance of Defendant's activities, (*Id* at 4274-4275). Agent Donovan received information that Defendant, Earnest Proge, and Whigham drove to a restaurant in two vehicles. After the group entered the restaurant, another man took Whigham's vehicle, drove it into a garage, and returned it shortly afterwards to its parking spot (RE 491, Transcript, Pg ID 4274-4277). Whigham (in the Volkswagen) and Defendant and Proge (in the truck with the tracker) left and drove in tandem toward Detroit (*Id* at Pg ID 4277). At the request of Agent Donovan, MSP set up surveillance at the Michigan border, and Trooper Matthew Kiser later stopped Whigham (*Id* at 4279-4281). According to Trooper Kiser, the search that led to the heroin seizure was consented to by Whigham (RE 493, Transcript, Pg ID 4618-4628). DEA agents continued surveillance of Defendant's truck, and observed it exit the highway, turn around, and drive past the stop of Whigham (RE 491, Transcript, Pg ID 4281-4288).

The second event occurred on June 28, 2010, and involved the stop of Juan Valle's vehicle by MSP, on an interstate near the Lansing area (*Id* at 4300-4301). The stop resulted in a search and seizure of about $150,000.00 in clear wrap from a

constructed compartment in the vehicle (*Id* at 4301-4304). This seizure started with a meeting of Carlos Powell and Valle at 20109 Conley, a residence in Detroit, that was captured in part by video recordings from a camera installed on a nearby utility pole, and shown during the trial (*Id* at 4292-4300). There was also physical surveillance by DEA Agents that involved trailing Valle's departure, and requesting a stop of his vehicle by MSP (*Id* at 4300). Trooper Matthew Unterbrink testified to a consent search that led to the cash seizure (RE 492, Transcript, Pg ID 4404-4410).

The third event occurred on September 17, 2010, and involved the traffic stop of Earnest Proge's vehicle (Ford Flex), along with his arrest for fleeing the initial stop, by MSP on the interstate near Kalamazoo (RE 493, Transcript, Pg ID 4567-4569, 4577-4579). The stop and arrest resulted in the seizure from suitcases of $2.2 million and ledgers, and a printed news article of a police drug raid and plastic wrapping materials, that were submitted for fingerprint analysis (*Id* at 4582-4591).

This seizure started with a meeting between Carlos Powell and Defendant at 15765 Stricker, a residence of Eastpointe, that was captured on video by another camera installed on a nearby utility pole (*Id* at 4567-4572). The video was played showed the arrival of Carlos Powell arriving in one vehicle and Defendant in the Flex, and then Carlos leaving with a bag, and Defendant wearing latex gloves and loading suitcases into the Flex before departing. Defendant drove to a warehouse on

Sherwood, located in the Detroit suburb of Centerline, where another pole camera had been installed (*Id* at 4567-4573). The video showed Defendant meeting Tobias and Earnest Proge at the warehouse, and the departure of Earnest in the Flex, and Tobias and Defendant in his truck (*Id* at 4572-4577). Agent Donovan's evidentiary hearing testimony indicated that the GPS tracker was attached to Defendant's truck, and his prior monitoring of it had shown a pattern of trips to the Kalamazoo area (RE 296, Transcript, Pg ID 2253-2254).

Agent Donovan's trial testimony indicated that he decided to stop the Flex, which was traveling with Defendant's truck, set up physical surveillance on the interstate, and requested MSP to stop the Flex (*Id* at 4577-4579). According to the testimony of Trooper Ryan Maki, he stopped the Flex, and Earnest Proge was "incredibly nervous" and did not have his driver's license, and suddenly fled the stop, nearly hitting Trooper James Gochanour, who had arrived in his car and was walking in front of Proge's vehicle (RE 492, Transcript, Pg ID 4404-4416). A high speed chase ensued, that went on, off, and back-on the interstate, until Proge slowed down and was stopped by Trooper Gochanour, and arrested (*Id* at 4416-4418). Agent Donovan and others continued surveillance of Defendant's truck after the initial stop of Proge, and observed the truck exit the interstate, stop at a gas station, and then re-

enter at a high rate of speed, and follow the chase for awhile, before heading back toward Detroit (RE 493, Transcript, Pg ID 4579-4582).

Agent Donovan testified that a Target store receipt stamped "9/10/2010, 3:20pm", for the purchase of luggage, was also found during the vehicle search (*Id* at 4582-4591). William Brennan, a security officer for Target, located surveillance video for the receipt, that was played, and apparently showed, Defendant making the purchase and exiting the store with suitcases (RE 493, Transcript, Pg ID 4629-4634). Joseph Abrozich, a DEA Fingerprint Specialist, identified two latent fingerprints found on the seized plastic materials as those of Defendant (RE 494, Transcript Pg ID 4709-4710), and two latent thumb prints found on the seized news article as belonging to Carlos Powell (*Id* at 4715-4716).

The fourth event occurred on October 6, 2010, and involved no stop or search, but rather surveillance of Defendant, which began with in Chicago with information from agents there (RE 493, Transcript, Pg ID 4591-4592). In response, Agent Donovan set up surveillance on the interstate near Kalamazoo, for a Ford Taurus driven by a female (later identified as Shamia Lewis), an older Oldsmobile driven by Tobias Proge, and Defendant's truck. The vehicles were located and surveilled to Detroit, where Earnest Proge took over driving the Taurus from Ms. Lewis, and followed Defendant's truck to the Sherwood warehouse (*Id* at 4592-4594). A pole

camera video from the following morning (October 7, 2010), was played, and showed Carlos Powell arriving at the Stricker residence, going in and out of the garage, and carrying items with gloves on (*Id* at 4594-4598). DEA John Kennelly from Chicago added that on October 6, 2010, he conducted surveillance there upon a request from Detroit, and observed a truck, an Oldsmobile, and a Taurus, into which a subject placed a suitcase, and he introduced a photograph of it (RE 494, Transcript, Pg ID 4661-4664). Agent Kennelly testified that he also conducted surveillance in Chicago on June 23, September 30, and October 20, 2010, and saw the same individuals and vehicles, and identified surveillance photographs (*Id* at 4665-4667).

The fifth event occurred on October 22, 2010, and involved the traffic stop of Margarita de Vallejo (who was a witness for the government, RE 494, Transcript, Pg ID 4735-4778), by MSP on the interstate driving from Ann Arbor (RE 496, Trial 5/7/2014, Pg ID 5089-5092). The stop resulted in a search and seizure of suitcases containing about 12 kilos of cocaine, $2 million, ledgers, and tally sheets, and plastic materials that were submitted for fingerprint analysis (*Id* at 5092-5100). This seizure began with a pole camera video from the Stricker residence that showed Carlos Powell was present, while Defendant loaded suitcases or items into his truck before departing (*Id* at 5086-5089). Agent Donovan's evidentiary hearing testimony indicated that the

11

GPS tracker was attached to Defendant's truck, and he used it to locate Defendant near Ann Arbor later in the day (RE 296, Transcript, Pg ID 2279-2282).

Agent Donovan set up surveillance, and followed Defendant's truck, traveling in tandem with a Taurus driven by Earnest Proge, to an Ann Arbor motel. There, they loaded large suitcases into an opened trunk of a Toyota, and departed (RE 496, Transcript, Pg ID 5090-5092). Ms. de Vallejo exited the motel shortly afterwards, and drove the Toyota to the interstate, where she was stopped (*Id* at 4243). MSP Trooper Russell Bawks testified that he assisted Trooper Denise Rule in a consent search of the car (RE 494, Transcript, Pg ID 4685-4690). Specialist Abrozich identified a palm print from the seized plastic materials seized as belonging to Defendant (RE 494, Transcript, Pg ID 4718-1719).

The sixth and final event involved the execution of search warrants at nine properties on November 17, 2010 (RE 496, Trial 5/7/2014, Pg ID 5100-5102), and five agents testified about those seizures, including Agent Donovan (RE 495,Transcript, Pg ID 4965-4973; 4974-4982; RE 496, Transcript, Pg ID 5034-5052; 5056-5069; 5102-5107). Among the most pertinent seizures were about five kilos of heroin and $5 million and guns from the Stricker residence, (RE 496, Trial 5/7/2014, Pg ID 5034-5042, 5044-5046); about $2.3 million and guns from the residence of Carlos and Tamika Powell on Apple Creek, in Washington Township, (*Id* at 5056-

5060, 5065-5068); about $600,000.00 from a residence associated with Carlos Powell on Oyster Cove, in West Bloomfield (RE 496, Transcript, Pg ID 4966-4969); $150,000.00 and three luxury vehicles from the residence of Defendant and his girlfriend on Franklin Farms, in Franklin (*Id* at 5102-5104, 5106-5107).

Ted Morola, who had been indicted in Arizona in 2009 for continuing criminal enterprise, and distribution of heroin, cocaine, and marijuana, and had pled guilty in exchange for sentence and other considerations for charged family members, testified for additional considerations from the government in this case, and implicated Carlos Powell in drug trafficking (RE 491, Transcript, Pg ID 4340-4346, 4370-4371). There was also testimony about cash transactions and expenditure by, or on behalf, of Carlos Powell and Defendant (RE 495, Transcript, Pg ID 4825-4893, 4927-4936). Other pertinent facts are contained within the following arguments.

## SUMMARY OF ARGUMENT

The trial judge erred in denying Defendant's Motion to Suppress Evidence derived from the collection of cellular phone identification and location data. The trap and trace orders at issue allowed the collection of data beyond the reach of the statute under which they were issued, and the use and inclusion of that improperly obtained information tainted the cell-site/GPS warrants which followed. Those warrants were not sufficiently supported by probable cause and overbroad. These circumstances, and the improper omission of information of information from the affidavits upon which the warrants were issued, precludes the application of the good-faith exception to the exclusionary rule. Furthermore, the unlawful and warrantless use of a GPS tracking device, which was deployed over an extended period of time, and was central and integral to the overall investigation, requires the exclusion of evidence obtained through its use and exploitation.

Likewise, the lengthy employment of pole cameras, without a showing or finding of probable, was a Fourth Amendment violation, and evidence based on exploitation of information obtained through the cameras should have also been excluded.

**I    THE TRIAL JUDGE ERRED IN DENYING DEFENDANT'S MOTION TO SUPPRESS CELLULAR TELEPHONE IDENTIFICATION AND LOCATION DATA.**

> **Standards of Review: "When reviewing the denial of a motion to suppress, we review the district court's findings of fact for clear error and its conclusions of law de novo." United States v. Johnson, 656 F3d 375, 377 (6th Cir 2011)(citation, quotations omitted).**

Before trial, on April 15, 2012, Defendant Eric Powell, along with other Co-Defendants, including his brother Carlos Powell, filed a Motion to Suppress Evidence and Request for Evidentiary Hearing (RE 74, Pg ID 158-185). The motion challenged data of various types, obtained in various ways, relating to cellular telephones, and the evidence derived from that data, which directed and drove the investigation in this case, and led to Defendant's convictions. The motion challenged the following methods of collecting data:

- The issuance of Rule 41 warrants sought by the government for live or real-time, cell-site and precise GPS location data for cell phones, each warrant for periods of 30 and 45 days, starting on March 11, 2010;

- Orders sought and obtained by the government, based on the purported authority of 18 USC § 3123, that authorized the use of a pen register/trap and trace device to identify the phone numbers and other identification information for cell phones, and to enable investigators to determine the

locations of those phones, starting on March 16, 2010;

- The warrantless use by investigators of GPS tracking devices, affixed to a vehicle operated by Defendant, to monitor the devices and to obtain the whereabouts of the vehicle and its occupants, starting on or about June 10, 2010.

The information obtained by these methods led or materially contributed to:

(1) The June 23, 2010 warrantless search of a vehicle driven by Benny Whigham;

(2) The June 28, 2010 warrantless search of a vehicle driven by Juan Valle;

(3) The September 17, 2010 warrantless search of a vehicle driven by Ernest Proge;

(4) The October 22, 2010 warrantless search of a vehicle driven by Margarita de Vallejo;

(5) The November 8, 2010 search, under the authority of warrants, for the following premises: (a) 20109 Conley Street, Detroit, Michigan; (b) 15765 Stricker, Eastpointe, Michigan; (c) 57869 Apple Creek Drive, Washington Township, Michigan; (d) 6748 Oyster Cove, West Bloomfield, Michigan; (e) 24505 Franklin Farms Drive, Franklin, Michigan; (f) 24300 Sherwood Avenue, Centerline, Michigan; and (g) 11137 Outer Drive, Detroit, Michigan.

Defendant argued that the cell-site/GPS warrants were over broad, and not supported by adequate showings of probable cause, and that applications were fatally tainted by the inclusion of data unlawfully obtained by the pen/trap orders (RE 74, Motion ¶ 5, Pg ID 159-160). Defendant argued that the pen/trap orders, which allowed for the collection of "autonomous" (as opposed to intentional) data, was beyond the reach of the pen/trap statute, under which the orders were issued, and violated the Fourth Amendment, in that the orders authorized location data without a showing of probable cause or even reasonable suspicion (*Id* at ¶ 8, Pg ID 161). He also argued that the warrantless use of GPS tracking devices violated the Fourth Amendment (*Id* at ¶ 9, Pg ID 161). And lastly, Defendant argued that the illegalities of each of these information-gathering methods tainted the physical searches and seizures of the foregoing vehicles and properties (*Id* at ¶ 11, Pg ID 161-162).

On January 4, 2013, the trial judge issued an Opinion and Order (1) finding that Defendants Eric Powell and Carlos Powell had standing to contest the evidence challenged in the suppression motion; (2) denying the motion as to the pen register/trap and trace orders; and (3) ordering an evidentiary hearing regarding investigators' use of GPS tracking devices without a warrant (RE 167, Pg ID 1265-1280). The evidentiary hearing was held on January 17, 2013, and February 13, 2013, and DEA Agent Edward Donovan was the only witness to testify (RE 176, Pg ID

17

1393-1457, RE 296, Pg ID 2253-2314). In a 58 page Opinion and Order dated May 3, 2013, the judge denied Defendant's other challenges (RE 202).

The arguments raised in this issue will be discussed *seriatem*.

**PEN REGISTER/TRAP AND TRACE**

The government made applications and obtained orders granting permission to operate sensing devices to obtain electronic data "autonomously" transmitted from the cell phones in nearby areas, and described as:

> "... radio signals emitted from wireless cellular telephones in the vicinity of the Subject that identify the telephones (e.g., by transmitting the telephone's serial number and phone number) to the network for authentication. By determining the identifying registration data at various locations in which the Subject Telephone is reasonably believed to be operating, the telephone number corresponding to the Subject Telephone can be identified. Data transmitted during autonomous registration is not dialed or otherwise controlled by the telephone user. It is an autonomous transmission that occurs when the phone is turned on and periodically thereafter, regardless of whether a call is being made, and in fact, is clearly separate from the establishment or maintenance of a call."
> (RE 74-12; Application, May 17, 2010; Pg ID No. 506).

The applications and orders were made and obtained under the Pen Register/ Trap and Trace statute, 18 USC § 3121 *et seq*, which allows for orders without a showing of probable cause, but rather on the basis of an application by a government attorney, and "a certification by the applicant that the information likely to be obtained is relevant to an ongoing criminal investigation . . ." 18 USC § 3122(b)(2). This was

18

according to <u>Smith v. Maryland</u>, 442 US 735 (1979), but <u>Smith</u> was decided before cell phones, and involved a monitoring device attached to a fixed, landline telephone, which captured digits dialed by subscribers in placing calls. *Id* at 737, 742. The Supreme Court held in <u>Smith</u>, 442 US at 742, that the use of a pen register did not implicate Fourth Amendment rights because telephone subscribers would not "entertain any expectation of privacy in the numbers they dial," and thereby voluntarily convey to third-party telephone companies.

Defendant maintains, and did so in the trial court, that the analysis in <u>Smith</u>, and the Pen/Trap statute, do not apply to the "autonomously" transmitted data involved in this case. The definition section of the statute, 18 USC 3127, defines the type of devices or process that is authorized as follows:

> "(3) the term "pen register" means a device or process which records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility ***from which a wire or electronic communication is transmitted***, provided, however, that such information shall not include the contents of any communication, but such term does not include any device or process used by a provider or customer of a wire or electronic communication service for billing, or recording as an incident to billing, for communications services provided by such provider or any device or process used by a provider or customer of a wire communication service for cost accounting or other like purposes in the ordinary course of its business;
> (4) the term, trap and trace device" means a device or process which captures the incoming electronic or other impulses which identify the originating number or other dialing, routing,

19

addressing, and signaling information reasonably likely to identify the source *of a wire or electronic communication*, provided, however, that such information shall not include the contents of any communication. . ."

(emphasis added)

Thus, by its terms, the statute applies to data associated with wire or electronic "communication." Autonomous transfers of data are not "communications." Indeed, this point was suggested by this Court's opinion in United States v. Forrest, 355 F3d 942, 949 (6th Cir 2004), *vacated on other grounds*, 543 US 1100 (2005) during a discussion regarding the interception of cell-site data:

> "A strong argument exists, however, that cell-site data is not a form of *communication* at all. Communication is defined as "a verbal or written message," or "a process by which information is exchanged between individuals through a common system of symbols, signs, or behavior." Merriam-Webster's Collegiate Dictionary 233 (10th ed. 1997). Cell-site data is not a "message," nor is it "exchanged between individuals," but instead is simply data sent from a cellular phone tower to the cellular provider's computers. In contrast, this court has assumed that a phone number transmitted to a pager constitutes an electronic communication. See United States v. Meriwether, 917 F2d 955, 960 (6th Cir 1990).Unlike cell-site data, a phone number sent via a pager is a "message" that is "exchanged between individuals.""

The issue was not resolved in Forrest, but the point was noted again by the Third Circuit in In re Application of the United States, 620 F3d 304, 317-318 (3rd Cir 2010):

> "A cell phone customer has not voluntarily shared his location information with a cellular provider in any meaningful way. . . [I]t is unlikely that cell phone customers are aware that their

cell phone providers collect and store historical location information. Therefore, [w]hen a cell phone user makes a call, the only information that is voluntarily and knowingly conveyed to the phone company is the number that is dialed and there is no indication to the user that making that call will also locate the caller; when a cell phone user receives a call, he hasn't voluntarily exposed anything at all."

(citation, quotations omitted).

Defendant maintains that the Pen/Trap statute did not authorize the acquisition of cell-site information, and the trial judge erred in ruling as follows:

"The statute, 18 USC § 3127(3), states:

"the term 'pen register' means a *device* or process which *records* or *decodes dialing, routing, addressing, or signaling information transmitted by an instrument* or facility *from which a wire or electronic communication is transmitted*, provided, however, that such information shall not include the contents of any communication . . ."

Under this expansive language, it is plain to the Court that the collection of Carlos Powell's cell phone identification data was permissible. The government used a device, that recorded information (the phone identity and numbers) transmitted by an instrument (the cell phone) from which a communication was transmitted (the voice conversations or text messages on a phone), but the government did not record the actual communication." (RE 167, Order, Pg ID No. 1276).

The record further indicates that investigators used a device to confirm or acquire location information, as illustrated by the following reference to Carlos Powell in one of several applications made under 18 USC § 2703, through which the

21

government obtained subscriber records for various phones, for periods of between 17 and 254 days, that were incorporated in the warrant application for cell-site/GPS location data"

> "On April 20, 2010, at approximately 3:30am, members of the Detroit DEA arrived at Carlos Powell's residence in Eastpointe, Michigan. Upon arrival at the residence Agents located Carlos Powell's vehicle parked in the driveway of the residence. While at Powell's residence, agents electronically identified Nextel cellular telephone 313-293-0755, hereafter referred to as Target Telephone #1. The DEA agents knows that Target Telephone #1 was the only Nextel cellular telephone identified at this location. Therefore, the DEA agent believes that the Target Telephone is currently utilized by Powell." (RE 74-10, Application, Pg ID 341).

Use of trap-and-trace devices to locate a phone and its user by inference (because it is the only inference that hte application's conclusion supports), appears to be foreclosed by the Communication Assistance for Law Enforcement Act of 1994 (CALEA), 47 USC § 1001, *et seq*, which provides, among other matters, that "with regard to information acquired solely pursuant to the authority for pen registers and trap and trace devices. . . call-identifying information shall not include any information that may disclose the physical location of the subscriber (except to the extent that the location may be determined from the telephone number." 47 USC § 1002 (a)(2).

The trial judge made no mention of the foregoing facts in its Opinion dated

January 4, 2013:

> "While the moving Defendants are correct that the collection of location data pursuant to a pen/trap order without additional authority may present more problems, the moving Defendants do not present any evidence that the government actually collected or used location data under the pen/trap orders at issue here. The moving Defendants point to no situation in which location data was gathered, or used illegally, either in support of another warrant application, or in what the government will seek to prove in its case in chief." (RE 167, Pg ID 1277).

It is conceded that the exclusionary rule is not generally applied to violations of statutes, absent any violation of underlying constitutional rights, unless the statute expressly provides for that remedy. *See, e.g.* United States v. Page, 232 F3d 536, 541 (6th Cir 2000)(citing United States v. Giordano, 416 US 505, 524 (1974)). However, whether or not this Court's decision in United States v. Skinner, 690 F3d 772, 781 (6th Cir 2012), forecloses an argument that the improper use of pen/trap devices in this case implicated Defendant's Fourth Amendment rights, the illegality of that collection of data is not without significance to the subsequent cell-site/GPS warrants, discussed in the following section.

**CELL-SITE/GPS WARRANTS**

Defendant challenged all of the real-time, cell-site/GPS warrants on the grounds that the affidavits in support failed to establish present probable cause, and were over

broad, in that each application sought and obtained authority to search for information which was not evidence, but rather only "lead to" evidence (*See, e.g.,* RE 74, Motion, Pg ID 159-160; RE 106, Supplement, Pg ID 193-794). Defendant argued that the second (March 31, 2010) and subsequent warrants were tainted by the reliance of the supporting affidavits on information illegally obtained by the preceding searches (*See, e.g.*, RE 74, Motion, Pg ID 159-160).

Defendant also argued that the affidavit for the first of these warrants (March 11, 2010), for a telephone subscribed to Carlos Powell at a home address on his Michigan driver's license, failed to include information that was contained in subsequent affidavits, and that if that information had been included, it would have further depreciated the probable cause showing in the affidavit for the first warrant (RE 106, Supplement, Pg ID 193-794). Defendant sought a hearing under Franks v. Deleware, 438 US 154 (1978), and identified the following representations from subsequent affidavits:

> "17. * * * Based on experience and training, your affiant knows that it common for individuals involved in narcotics trafficking to obtain cellular phones in nominee or fictitious names to avoid detection by law enforcement." (RE 74-2, Affidavit, March 31, 2010, Pg ID 198); and
>
> _____
>
> 16. * * * Your affiant also knows that members of these drug trafficking organization very often maintain one cellular phone to communicate with their close associates and/or drug

suppliers and that these individuals maintain a second, third, or even a fourth cellular telephone to communicate with customers, and/or outside associates. Your affiant knows that these individuals utilize strict cellular telephone discipline as a way to attempt to avoid detection from law enforcement." (RE 74-3, Affidavit, May 7, 2010, Pg ID 212).[1]

The trial judge's Opinion focused on the first warrant (March 11, 2010), and initially held that "in light of the considerable, and distinctive, privacy concerns raised by long-term, real-time cell-site tracking . . . a specific showing is required to establish probable cause when the government seeks a warrant for long-term real-time tracking of an individual by a cell phone (RE 202, Pg ID 1619). The judge explained:

"* * * Such a showing should include facts supporting, at least, the following:

First, that the actual location of the person the government intends to track via the cell phone is relevant to the investigation of the ongoing crime, or evidence sought. That is, if the government intends to track an individual over a long period of time, and cannot show that the individual will be, for example, in public, non-protected locations for the duration of the tracking, then the warrant application should set forth facts that warrant intrusion into protected locations that the individual may frequent. In other words, the government should set forth a probable-cause basis for following the

---

[1] Taken together, these statements undermine the likelihood that Carlos Powell would be using a telephone subscribed in his own name, at his home address, in connection with drug related activity. It is well-established that "[i]ntentional or reckless omissions of material information, like false statements, may serve as the basis for a Franks challenge." Rivera v. United States, 928 F2d 592, 604 (2nd Cir 1991).

individual into protected area via the individual's personal cell phone.

It is true that, in a sense, a person's location is in some way *always* relevant to his potential participation in a crime, and, a person does not have a general privacy interest in his location. But before the government may use an individual's cell phone to track him into areas in which an individual *does* have a reasonable expectation of privacy, the government should show more than that the person is suspected of a crime; the government should show that the person's location in the protected area is in some way relevant to the ongoing investigation of criminal activity. *See generally* United States v. Frazier, 423 F3d 526, 532 (6th Cir 2005) ("The critical element in a reasonable search is not that the owner of property is suspected of crime but that there is reasonable cause to believe that the specific 'things' to be searched for and seized are located on the property to which entry is sought.").

Second, the government should show that the specific *cell phone*, as well as the person to be tracked, is relevant to the investigation. That is, the government must show there is a nexus between the cell phone, the suspect, and the information sought. *See generally* United States v. Carpenter, 360 F3d 591, 594 (6th Cir 2004) (warrant application must show 'a nexus between the place to be searched and the evidence to be sought'); *see also, e.g.*, United States v. Sierra-Rodriguez, 10-200338, 2012 WL 1199599, at *6 (E.D Mich. April 10, 2012) (finding probable cause shown where the affidavit provided substantial basis to conclude that specific cell phone tracked belonged to suspect embarking on criminally-related travel). This means that the government should show that a criminal suspect under investigation is the likely use of the cell phone at issue and that he or she uses the cell phone in connection with criminal activity. Investigation of a criminal organization using multiple phones, including dedicated phones for criminal activity, over the course of the operation would require the government to make a showing as to each phone it intends to

26

track. The logic of this requirement is simply that, drawing on the Fourth Amendment's particularity requirement, tracking a phone used in furtherance of criminal activity is likely to lead to evidence of criminal activity, whereas tracking phones, the use of which is unconnected to criminal activity, will likely demonstrate where a person conducts highly personal business.

In sum, because 'the belief that the items sought will be found at the location to be searched must be supported by less than prima facie proof but more than mere suspicion,' to establish probable cause for long-term, real-time, cell-site tracking, the government should have to demonstrate a nexus between a suspect and the phone, the phone and the criminal activity, as well as the criminal activity and suspect's location in protected areas, rather than merely probable cause that the person is engaged in criminal activity. *See generally* <u>United</u> <u>States</u> <u>v.</u> <u>Williams</u>, 544 F3d 683, 686 (6th Cir 2008)."

*Id* at Pg ID 1620-1621)[2].

The judge then found that the affidavit on which the March 11, 2010 warrant was based did not meet this standard, but that it did establish, in his view, that "a substantial basis existed to find probable cause that Carlos Powell was a drug dealer and that tracking his cell phone would lead to evidence of a crime." *Id* at Pg ID 1627-

---

[2]  The judge added:

"The cell-phone tracking standard is meant to be read in harmony with the Sixth Circuit's holding in <u>Skinner</u>. Specifically, if the government seeks to track an individual for a short period of time only, with no forseeable intrusion into protected areas, the probable cause showing discussed here would not apply and <u>Skinner</u> would plainly govern."     *Id* at Pg ID 1623

1629. The judge declined to order suppression on the basis of the "good faith exception" to the exclusionary rule under <u>United States v. Leon</u>, 468 US 897 (1984):

> "Under the Court's construction of the applicable precedent, the government did not make a sufficient showing to demonstrate that probable cause existed for the warrant to issue. The evidence is nonetheless admissible, however, because whether or not the warrant issued on probable cause, the government relied on it in good faith. *See*, [<u>United States v</u>] <u>Burford</u>, 632, F3d [264], 271 [(6th Cir 2011)] ('[S]uppression is not an available remedy when police officers conducted a search in good faith reliance on some higher authority, such as a warrant or a statute, even if the warrant or statute were later held invalid or unconstitutional (the 'good faith exception').') (citation omitted).
>
> The exception is not absolute. The Supreme Court has outlined four scenarios when good faith reliance on a warrant is not sufficient: '(1) when the warrant is issued on the basis of an affidavit that the affiant knows (or is reckless in not knowing) contains false information; (2) when the issuing magistrate abandons his neutral and detached role and serves as a rubber stamp for police activities; (3) when the affidavit is so lacking in indicia of probable cause that a belief in its existence is objectively unreasonable; and, (4) when the warrant is so facially deficient that it cannot reasonably be presumed to be valid.' <u>United States v. Leon</u>, 468 US 897, 914 (1984))."
>
> Defendants argue that the exception does not apply here because the affidavit is lacking in indicia of probable cause, such that the DEA's reliance on it was objectively unreasonable. An affidavit is lacking in indicia of probable cause, also known as a 'bare bones' affidavit, if it contains only 'suspicions, beliefs, or conclusions, without providing some underlying factual circumstances regarding veracity, reliability, and basis of knowledge.' <u>United States v. Laughton</u>, 409 F3d 744, 748-49 (6th Cir 2005) (quoting <u>United States v.</u>

28

Weaver, 99 F3d 1372, 1378 (6th Cir 1996)). This standard is 'a less demanding showing than the "substantial basis" threshold required to prove the existence of probable cause in the first place.' *Id* (quoting [United States v.] Carpenter, 360 F3d [591,] 595 [(6th Cir 2004)]). The Court has already found that the affidavit met the substantial basis threshold; it necessarily was also not lacking in indicia of probable cause. Accordingly, the good faith exception applies. The evidence obtained pursuant to the March 11, 2010 warrant for real-time cell-site location data is admissible and will not be suppressed."
(*Id* at Pg ID 1629-1630).

From this conclusion, the judge also denied Defendant's claims of derivative

illegality based on the use of information obtained under the warrants:

"Defendant's argue that if the initial March 11, 2010 search was unreasonable, any evidence obtained from it - specifically the subsequent real-time cell-site location-data search warrants - are 'fruit of the poisonous tree' and are therefore inadmissible. Defendants are correct that when the government exploits illegally obtained evidence subsequent searches and seizures based on that evidence are tainted and subject to the exclusionary rule. *See* [United States v] Pearce, 531 F3d [374,] 381 [(6th Cir 2008)] (citing Wong Sun [v United States], 371 US [471,] 484-85 [(1963)]). But because all the evidence obtained pursuant to the March 11, 2010 warrant is admissible under the good faith exception, the remaining warrants are, therefore, not based on any tainted material that would justify suppression under the derivative rule. Moreover, having reviewed the affidavits submitted in support of each warrant, the Court also finds that the government obtained the warrants from a neutral and detached magistrate judge based on more than a "bare bones" affidavit, and that therefore, the evidence obtained from the subsequent warrants is also admissible under the good faith exception."

(*Id* at Pg ID 1630).

Defendant contends that the above ruling regarding derivative illegality did not address the substance of his arguments, and that examination of those arguments demonstrates that the good-faith exception does not save the fruits of the search conducted under the March 11 warrant, or the warrants that followed it.

First, even if the conclusion that the March 11 affidavit provides a "substantial basis" for the proposed search, the judge's opinion ignores Defendant's argument that the warrant (and those which followed) were " so facially deficient" under <u>Leon</u>, 468 US at 923, that the good faith exception cannot be applied, because the warrant allowed collection of data which was beyond the Fourth Amendment, in that it was not evidence, but might only "lead to evidence." (RE 74, Motion, Pg ID 177-178; RE 127, Reply, Pd ID 930-931). As the March 11 warrant stated with respect to the finding of probable cause:

> "The Court finds that there is probable cause to believe that the Requested Information will lead to evidence of violations of Title 21, United States Code, Sections 841 (a)(1) and 846, among other offenses, as well as to the identification of individuals who are engaged in the commission of these offenses." (RE 106-1, Pg ID 808) *See also*, RE 74-2, March 31, 2010 Warrant, Pg ID 201.

A fundamental of Fourth Amendment law is that it must be shown that there is probable cause to believe that a particular thing constitutes contraband or evidence of a crime before a warrant may authorize its seizure. *See, e.g.,* <u>United</u> <u>States</u> <u>v.</u>

<u>Washington</u>, 797 F2d 1461, 1472 (9th Cir 1986) ("where a business is searched for records, specificity is required to ensure that only records which evidence crime will be seized and other papers will remain private."). Furthermore, the seizure of "mere evidence" has long been understood to define the outermost boundary of the government's authority under the Fourth Amendment. As Justice Stevens stated for the Court in <u>United</u> <u>States</u> <u>v.</u> <u>92</u> <u>Buena</u> <u>Vista</u> <u>Avenue</u>, 507 US 111, 121 (1992):

> "[U]ntil our decision in <u>Warden, Md. Penitentiary</u> <u>v.</u> <u>Hayden</u>, 387 US 294, 87 SCt 1642, 18 LEd2d 782 (1967), the Government had power to seize only property that "'the private citizen was not permitted to possess.'" The holding in that case that the Fourth Amendment did not prohibit the seizure of "mere evidence" marked an important expansion of government power. *See* <u>Zurcher</u> <u>v.</u> <u>Stanford</u> <u>Daily</u>, 436 US 547, 577-580, 98 SCt 1970, 1987-1989, 56 LEd2d 525 (1978) (Stevens, J., dissenting)." (footnote omitted).

The summary provisions of the affidavits upon which all the cell-site/GPS warrants were based also stated the conclusion that "there is probable cause to be that the Requested Information will lead to evidence regarding crime activities." *See*, Re 106-1, March 11, 2010 Affidavit ¶ 16, Pg ID 805; RE 74-2, March 31, 2010 Affidavit ¶ 21, Pg ID 199; RE 74-4, May 31, 2010 Affidavit ¶ 38, Pg ID 237; RE 74-6, June 17, 2010 Affidavit ¶ 37, Pg ID 274; RE 74-9, October 5, 2010 Affidavit ¶ 23, Pg ID 328; emphasis added).

Second, the good faith exception is foreclosed by affiant's omission of material information, as clearly indicated by the foregoing <u>Franks</u> argument, which was presented in the district court. *See*, <u>Leon</u>, 468 US at 923.

And lastly, as argued by Defendant in the district court, under the law of this Circuit, "the <u>Leon</u> good faith exception is inapplicable where a warrant was secured in part on the basis of an illegal search or seizure. <u>United</u> <u>States</u> <u>v.</u> <u>Davis</u>, 430 F3d 345, 358 n4 (6th Cir 2005) (citing <u>United</u> <u>States</u> <u>v.</u> <u>Reilly</u>, 76 F2d 1271, 1282 (2nd Cir 1996) - collecting cases; <u>United</u> <u>State</u> <u>v.</u> <u>Bishop</u>, 264 F3d 919, 924 n2 (9th Cir 2001). Defendant pointed out that information unlawfully obtained by pen/trap orders was crucial to the probable cause showings of certain cell-site/GPS warrants, because it was only by the use of pen/trap devices that agents were able to discover the identity of cell phones which were the targets of those warrants.

With respect to this last argument, the record does not show that the March 11 warrant was the product of these illegalities, but it is clear that the warrants allowing surveillance of cell phones, that were the subject of monitoring, that lead to physical searches and seizures, that were the heart of the governments case at trial, were identified by unlawful pen/trap orders. The first cell-site/GPS warrant, issued March 11, 2010, was for location data on a cell phone bearing the numver 313-529-5848 (RE 106-1, Pg ID 808). The second, issued on March 31, 2010, for 313-743-7714 (RE 74-

2, Pg ID 201); and the third and fourth, issued May 7, and June 17, 2010, for 313-293-0755, 313-293-0395, and 313-293-0754 (*See*, 74-3, Pg ID 206-207); RE 74-6, Pg ID 261-263, respectively). According to the affidavit for the third warrant (May 7), "[o]n or about April 20, 2010," the affiant "identified cellular telephone number 313-293-0755 as a telephone believed to be connected to the Powell Organization, and also identified 313-293-0395 and 313-293-0754 as Targets #2 and #3 connected to the Powell Organization (RE 74-4, Pg ID 234-237). While the affidavit does not state how this was done, it is clear that these identifications were critical to the establishment of probable cause for the cell-site/GPS warrant, and those that followed. As it turn out, these identifications were made by a pen/trace device (*See*, RE 74-10, Application, Pg ID 341), which the government acknowledged using for identification of a cell phone number for Eric Powell in March, 2010, and again after April 12, 2010 (RE 114, Response, Pg ID 847-848).

Defendant maintains that to the extent that the pen/trap orders in this case permitted, or resulted in, the gathering of location data on a long-term, real-time basis, his Fourth Amendment rights were violated. However, even if the Court disagrees, the illegality which attendant the pen/trap order should foreclose application of the good faith exception because, as indicated in <u>United</u> <u>States</u> <u>v.</u> <u>Warshak</u>, 631 F3d 266, 289

(6th Cir 2010), with respect to the good faith exception on a challenge to data collection under the Stored Communication Act:

> "* * * In Krull, the Supreme Court hinted that the goof faith exception does not apply if the government acted outside the scope of the statute on which it purported to rely. 480 US at 360 n17, 107, SCT 1160. It should be noted that this portion of the Krull Court's opinion was merely dicta, and it appears that we have yet to pass on the question. However, it seems evident that an officer's failure to adhere to the boundaries of a given statute should preclude him from relying upon in the face of a constitutional challenge."(footnote omitted).

## WARRANTLESS TRACKING DEVICES

The trial judge made the following findings regarding the installation and operation of the tracking devices in question, after hearing testimony from Case Agent Edward Donovan of the DEA:

> "1. Technical Background
>
> The DEA used a GPS tracker that affixes to the undercarriage or other unobtrusive spot on a vehicle. The tracker is "self-contained," and is found within a storage box that protects it from the elements. The box is attached with magnets to the undercarriage of a vehicle. *Id.* at 16. The GPS unit transmits its coordinates via the internet. During a typical operation, a DEA or other federal agent has a laptop computer with a wireless internet connection. At any time, the DEA agent can "ping" the GPS tracker by pressing a button on the tracking program. The GPS tracker then transmits its coordinates back to the computer. The program can ping a tracker at regular intervals as long as half an hour or as short as every minute, or whenever the agent wishes. *Id.* at 53; Hr'g II. There can be a time delay of up to ten minutes between when the GPS tracker transmits its coordinates and when the DEA agent receives the coordinates on the computer. Hr'g I at 54. The printed records of the

location data show only when the data was generated, and not when a DEA agent accessed or received the data. Hr'g II. The GPS tracking device is generally accurate to within several meters, and the location data will state the variation from the coordinate reading. For example, a 12-meter variation and a direction would indicate that the actual GPS unit could be within 12 meters from the coordinate reading. *Id.*

The location data is stored on a remote computer server, capable of being accessed by the DEA, and it is usually archived. Hr'g II. On cross-examination, Donovan testified that archived location data for the first two months of the tracking, beginning around June 10,2010, was inadvertently lost. Typically, the servers keep the data for several months. In this case, the servers overwrote the data as part of an apparently normal record storage procedure. The first available tracking records begin on or around August 31, 2010. *Id.*

2. GPS Tracker Installation and Re-Installation

Before placing the GPS tracking device on Eric Powell's truck, the DEA had amassed considerable evidence about the overall drug trafficking ring and Eric Powell's involvement in it. On approximately June 10, 2010, the DEA located Eric Powell's Chevy Silverado pickup truck parked in the driveway of Eric Powell's residence at 24505 Franklin Farms Drive, in Franklin, Michigan. Hr'g I at 19-21.The DEA changed out the battery on the tracking devices several times. Most of the time, the change-out was done in Eric Powell's driveway. On three occasions, the truck was parked elsewhere: in front of Earnest Proge's residence, in the commercial parking lot of a warehouse, and in the parking lot of a car dealership. *Id.* at 21-22.

Powell's home is in a gated community. A security gate blocked the entrance to Franklin Farms Drive, and on the gate there was a sign reading "private property, no trespassing." To install the GPS device, the DEA agents simply walked around the gate, as it is only a vehicular gate and does not bar foot traffic. Hr'g II. During daylight hours, Donovan has driven to the gate and it has opened automatically. *Id.* Donovan installed the GPS tracker at night, and is unsure whether or not the gate would have opened automatically at that time. *Id.*"

It was (and is) Defendant's position that the warrantless use of the tracking

device over an extended period of time (more than four and a half months, according

to the testimony at the evidentiary hearing on defendant's motion to suppress (RE 296,

Transcript, Page ID 1453-1454) was a Fourth Amendment violation, relying

principally on the Supreme Court's decision in *United States v. Jones,* ____ U.S. ___,

132 S.Ct. 945 (2012),[3] requiring suppression of the location data so acquired and,

more importantly, the searches they facilitated. The trial judge declined to decide the

question, however, on the basis of his conclusion that the warrantless vehicle searches

which accompanied the use of the tracking devices "would be admissible even if the

---

[3] *Jones,* of course, involved the attachment of a GPS tracking device to a vehicle and the use of that device to track the vehicle's movements over a period of 28 days. The four-justice lead opinion, authored by Justice Scalia, held that the Fourth Amendment was implicated by the physical intrusion involved - "[t]he Government physically occupied private property for the purpose of obtaining information." *Id.,* at 949. On the other hand, a different four justices joined a concurring opinion, written by Justice Alito maintained that surreptitious long-term monitoring of the defendant through the GPS device constituted a search because it "impinges on expectations of privacy." *Id.* at 964. Justice Sotomayor, writing separately, "agree[d] with Justice ALITO that, at the very least, 'longer term GPS monitoring in investigations of most offenses impinges on expectations of privacy.'" *Id.,* at 955, but observed that drawing appropriate limitations on the scope of such a rule posed difficulties, and "because the Government's physical intrusion on Jones' Jeep supplies a narrower basis for decision . . . join[ed] the majority's opinion." *Id.,* at 957. The warrantless use of the GPS trackers in this case would, defendant submits, be improper under either theory.

installation and use of the GPS tracker was an unreasonable search otherwise subject

to the exclusionary rule." R.E. 202, Order, Page ID # 1635.

The trial judge summarized the factual circumstances of the challenged traffic

stops as follows:

(a)     The June 23, 2010  warrantless search of a vehicle operated by Benny
        Whigham.

        "The first challenged stop after the GPS tracker was placed on
Eric Powell's truck, was the traffic stop of Benny Whigham's vehicle on
June 23, 2010. On June 22, 2010, the DEA determined, using the GPS
tracker, that Eric Powell had traveled from Detroit to Chicago. At some
point while Powell was in Chicago, the DEA lost the GPS tracker signal
from Powell's truck, and deployed agents to locate the truck visually.
Hr'g I at 38-40. The next day, the DEA began physical surveillance of
Powell's truck and Whigham's vehicle, following the vehicles to Cicero,
Illinois. *Id.*  In Cicero, Powell, Whigham, and Earnest Proge left the two
vehicles in a restaurant parking lot for a period of time during which an
unknown Hispanic male took Whigham's vehicle to a garage, and then
returned it to the parking spot several minutes later. *Id.* at 40. The agents,
assisted by the Michigan State Police, continued physical surveillance of
the vehicles for over ten hours, as they were driven in tandem from
Cicero back toward Detroit. Sullivan Aff. ¶ 11, ECF No. 74-9. A state
trooper stopped Whigham's vehicle for a traffic violation near Ann
Arbor, Michigan. Hr'g I at 44. Whigham granted the police consent to
search the vehicle. *Id.*; Sullivan Aff. at ¶ 13. The trooper found thirteen
kilograms of heroin in the vehicle. *Id.*"

                                                      (RE 202, Order, Page ID 1637-1638).

(b)     The June 28, 2010  warrantless search of a vehicle driven by Juan Valle

        "On June 28, 2010, the DEA was conducting surveillance of a
suspected stash location, a residence at 20109 Conley Street, Detroit,
Michigan, using pole cameras and physical surveillance. Nov. 8
Donovan Aff. ¶ 61, ECF No. 74-13; Resp. at 37-38. The DEA observed

37

Juan Valle arrive at the residence, followed shortly thereafter by Carlos Powell. Powell carried a large bag with him into the residence. When Valle emerged later, he placed several objects into his vehicle and drove away. Nov. 8 Donovan Aff. ¶ 61-62. The DEA coordinated with the Michigan State Police in Charlotte, Michigan, to track Valle's vehicle. State troopers stopped the vehicle after a traffic violation. Valle gave them his consent to search the vehicle. Resp. at 38. State troopers found roughly $259,000 in the vehicle. *Id.* at ¶ 63.

"Although the GPS tracking device was attached to Eric Powell's vehicle during this period, nothing in the record demonstrates that the tracking information had anything to do with the stop of Valle's vehicle. Donovan testified specifically that GPS location data from Eric Powell's vehicle was not used in the events surrounding this search. Hr'g I at 48. Accordingly, the Court finds the GPS tracking data played no, or a highly attenuated, role in this search. Because the traffic stop was legal and Valle consented to search, all evidence from the search is admissible." (*Id* at Page ID 1640).

(c)     The September 17, 2010 warrantless search of a vehicle driven by Earnest Proge

"Over the course of several weeks of investigation, which included some use of the GPS tracker, the DEA determined that on several occasions Eric Powell and Earnest Proge drove in tandem between Detroit and Michigan. Nov. 8, 2010 Donovan Aff. ¶ 68. On September 17, 2010, while the GPS tracker was still attached to Powell's truck, the DEA used surveillance cameras to independently observe Powell arrive at a residence in Eastpointe, Michigan, and, wearing latex gloves, load several large suitcases into Proge's Ford Flex. Hr'g I at 51; Nov. 8, 2010 Donovan Aff. ¶ 69. Powell drove the Ford Flex to a warehouse in Centerline, Michigan where the DEA continued surveillance of the vehicle using a different pole camera. *Id.* Later, the Ford Flex, now driven by Proge, departed from the warehouse. From their knowledge of Powell and Proge's previously tracked trips, the DEA dispatched agents along Interstate 94 to look for the Ford Flex. Hr'g I at 53. An agent spotted the vehicle proceeding west on Interstate 94 toward Kalamazoo, traveling in tandem with Powell's truck. *Id.* at 53; Nov. 8, 2010 Donovan

38

Aff. ¶ 70. The GPS device may or may not have been used to locate Powell's truck at the same time, but Donovan testified that in his opinion, the DEA would inevitably have located Proge's vehicle on the highway at some point that day because of the multiple DEA and Michigan State Police officers searching the highway for the vehicle. *Id.* at 57.

State troopers stopped Proge's vehicle in Calhoun County, after a traffic violation. Nov. 8 Donovan Aff. ¶ 71. Proge at first complied with the stop, but then fled the scene, nearly striking another police officer who had just arrived. Hrg. I at 59. Proge engaged the Michigan State Police in a high-speed chase before pulling over. The police arrested Proge for felony Fleeing and Eluding and Assault of a Police Officer, and searched his car. During the search of the vehicle, troopers discovered more than $2.2 million, as well as a drug ledger, and a newspaper article regarding a Detroit Police Department drug raid. *Id.*; Nov. 8 Donovan Aff. at ¶¶ 71-73."

(*Id* at Page ID 1642-1643).

(d)     The October 22, 2010 warrantless search of a vehicle driven by Margarita Lopez de Vallejo

"The final challenged traffic stop is the search of Margarita de Vallejo's car on October 22, 2010. Donovan had removed the GPS tracker from Eric Powell's truck sometime on September 17, 2010, because he believed its use may have caused suspicion among the drug traffickers. Hr'g I at 60. But on October 1, 2010, after learning that Eric Powell had apparently taken another trip to Chicago for the purpose of exchanging drugs, Donovan replaced the tracker. *Id.* at 61.

On October 22, 2010, the DEA, using a pole camera, observed Powell loading several suitcases from the Eastpointe residence onto his truck. Nov. 8 Donovan Aff. ¶ 89, ECF No. 74-14. The DEA again established surveillance along I-94 to look for the truck, as well as for a Ford Taurus that agents knew Proge had taken to driving. Hr'g I at 63. Agents spotted the vehicles on I-94 near Romulus, and followed them to the parking lot of a hotel in Ann Arbor. *Id.* at 63-65. Donovan testified that, although agents used the GPS tracking device to help track Powell's

movements, the DEA had a sufficient police presence on the road that the agents would inevitably have been able to physically track Powell's truck for the duration of the day. *Id.* at 64. At the hotel, the DEA observed Powell and Proge transfer the suitcases from the truck into a Toyota Camry parked behind the hotel. *Id.* at 65; Nov. 8 Donovan Aff. ¶ 94. The DEA agents followed the Toyota, driven by de Vallejo, away from the encounter, and did not follow Powell's truck. The agents then, in conjunction with the Michigan State Police, stopped the Toyota after de Vallejo committed a traffic violation. *Id.* During the stop, de Vallejo gave the officers her consent to search the vehicle. Nov. 8 Donovan Aff. ¶ 95. Officers found 12 kilograms of cocaine and roughly $2 million in currency in the car. *Id.* at ¶ 96."

(*Id* at Page ID 1642-1643).

The trial judge held that the Whigham stop and search were "sufficiently attenuated from use of the GPS tracker to preclude application of the exclusionary rule," employing a three-factor test he attributed to this Court's decision in United States v. Gross, 662 F3d 393 (5th Cir 2011): "(1) the length of time between the illegal search and discovery of new evidence; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the official misconduct."  *Id* at Page ID 1638.

"[T]he time factor," the judge wrote, "is neutral," since "the GPS tracker was used to locate Eric Powell's vehicle in Chicago nearly a full day before the traffic stop," and "[e]ven if the gap . . . can be considered close in time, temporal proximity alone, does not justify suppression." *Ibid.* The judge identified "multiple intervening circumstances," such as the fact that "the GPS tracker was not used to track Whigham's vehicle at all," that the "vehicle was directly observed by several DEA

agents that day," and "would have inevitably discovered Whigham's vehicle on the highway," as well as his conclusion that "[a]lthough the stop was pretextual, nothing in the record shows that Whigham did not actually violate the traffic laws justifying the stop." *Id* at Page ID 1639. The judge also held that "the agents' conduct was not flagrant," since they "had no reason to believe installation of the tracker was illegal," and had, in fact, "consulted extensively with the United States Attorney's Office and the DEA general counsel's office regarding use of the tracker." *Ibid.*

As to the stop of Juan Valle's vehicle, the judge found that "[a]lthough the GPS tracking device was attached to Eric Powell's vehicle during this period, nothing in the record demonstrates that the tracking information had anything to do with the stop of Valle's vehicle," and that the Case Agent had "testified specifically that GPS location data from Eric Powell's vehicle was not used in the events surrounding this search." *Id* at Page ID 1640.

In upholding the stop of the vehicle driven by Earnest Proge, the judge cited the principle that "that if a suspect's response to an illegal stop is a new and distinct crime, such as flight or use of force, any evidence recovered incident to the arrest for the subsequent crime is not tainted by the unlawfulness of the initial detention," citing this Court's decision in <u>United States v. Beauchamp</u>, 659 F3d 560, 574 (6th Cir 2011), and held that "[t]he search of Proge's vehicle occurred only after his arrest for

unlawful flight, thereby serving to attenuate whatever illegal taint the GPS tracker

may have initially provided." *Id* at Page ID 1642.

Finally, the judge upheld the stop of the vehicle driven by Margarita de Vallejo

on the basis of "the inevitable-discovery and attenuation doctrines:

> "First, although it is true that agents used the GPS tracker during the pursuit of Eric Powell's vehicle, they did so only after they had observed via the pole camera behavior indicating he was preparing to engage in another illegal drug or money transfer trip. Moreover, as Donovan testified, agents and state troopers were dispatched to locate the truck on the interstate and would inevitably have done so and been able to physically track Powell and Proge as they traveled to Ann Arbor where they met de Vallejo. For these reasons, the Court finds that the agents would inevitably have discovered de Vallejo's involvement, even without the GPS tracking evidence.
>
> Second, like the Whigham stop, the police detained de Vallejo pursuant to a lawful traffic stop, and de Vallejo gave her consent to search. Based on these intervening circumstances, and applying the same legal standards discussed during the Whigham analysis, the Court finds that the agent's use of the GPS device to track Powell was so attenuated from the DEA's actions in stopping de Vallejo's vehicle that the evidence seized in the stop is admissible."
>
> (<em>Id</em> at Page ID 1643-1644).[4]

These rulings are flawed in a number of significant ways: they are based on a

reading of the "attenuation" doctrine which is too narrowly drawn, and misconstrues

---

[4] Having upheld the vehicle searches (which provided the bulk of the information cited by the affidavit upon which they were premised), the judge also declined to suppress the evidence seized under the challenged search warrants. (RE 202, Order, Pg ID 1644-1646).

the significance of certain of the key "relevant factors," as identified by this Court in cases such as <u>United States v. Gross</u>, 662 F3d at 401, on which they purport to rely. In addition, in some instances, they simply ignore significant evidence developed by the testimony at the evidentiary hearing on the motion to suppress.

Thus, while it is true that in <u>Gross</u>, this Court did indeed identify "factors 'such as the length of time between the illegal seizure and the [discovery of evidence or the confession], the presence of intervening circumstances, [and] the purpose and flagrancy of the official misconduct'" as germane to the "attenuation" inquiry, the Court was also made it clear that one should "consider *all* relevant factors." *Id* at 401 (quoting <u>United States v. Lopez-Arias</u>, 344 F3d 623, 630 (6th Cir 2003)).

The trial judge's overly constrained, purely linear analysis ignores the realities of modern electronic surveillance techniques. Here, for more than four and one half months, the investigators relied on their ability to locate the subjects of their investigation through surreptitious, remotely available, electronic surveillance, including, of course, the GPS tracking device. Investigators knew, at all times, that they could locate the vehicle on which the device was placed from the comfort of their office (or anywhere else they liked), by the click of a mouse button or trackpad, and they did so day in and day out.

The electronic surveillance involved - including, the GPS tracker - drove and animated the investigation. It was central to it, and inseparable from the outgrowths of its use, including the several vehicle stops involved, since without it, it would have been impossible for the agents to structure the investigation the way they did - neither the inevitable limitations on human resources nor the practicalities of physical surveillance would have allowed them to keep tabs on the subjects or their vehicles at all times, over this extended period of time, in the way the trackers and other location acquisition techniques did. To try to parse out the particulars of any particular vehicle stop from the conduct of the investigation as a whole ignores these realities, and artificially, unrealistically, and unfairly constrains the attenuation/inevitable discovery inquiry. The electronic surveillance , including the GPS tracker, was an ever-present factor in every phase of the investigation - *just as it was intended to be* - and to ignore the implications of this fact as a "relevant factor" fatally skews the derivative illegality analysis.

In short, where, as here, all aspects of the ongoing investigation were interwoven, interdependent, and location-technology driven, it is simply unrealistic to say that *any* of the evidence "has been come at . . . by means sufficiently distinguishable to be purged of the primary taint" of the warrantless GPS tracking. Wong Sun v. United States, 371 US 471, 488 (1963).

44

This observation is illustrated by the testimony regarding the way in which the various surveillance techniques interacted in relation to the several vehicle stops at issue. For example, on September 17, when the agents deployed along I-94 in such profusion that the Case Agent opined that they would have inevitably spotted the vehicle driven by Earnest Proge, they did so in significant part because they had - aided by the GPS tracker - noted a pattern of trips along that route which suggested drug trafficking activity. (RE 296, Page ID 2272-2273). And, whatever confidence Special Agent Donovan might have had in the physical surveillance which had been established, the fact is that the agent or agents accessing the GPS tracker were actively employing it in their hunt - the data did indeed point to I-94, and the transmission of location data from that device, which was controlled by the monitoring agents, went from once every 30 minutes early in the day to three or four times per minute in the period just before the stop of Mr. Proge was effectuated - in real time, as much data as the equipment could possibly provide. *Id* at Page ID 2274-2277. [5]

In this thoroughly modern investigation, neither the physical surveillance, nor any of the other conventional investigative techniques, were in fact not

---

[5]The record further reflects that the tracking device was being used in the same way in connection with the events of October 22, leading up to the stop and search of the vehicle being driven by Margarita de Vallejo. (RE 296, Transcript, Page ID 2279-2282).

"distinguishable from," but, rather, inextricably entwined with, the electronic data

acquisition, and the judge's derivative illegality analysis was fatally flawed by his

failure to recognize this basic fact, notwithstanding the fact that it was explicitly

pointed out to him. *See, e.g.,* (RE 127, Reply, Page ID 935).

Beyond this conceptual failing, the trial judge's derivative illegality rulings

were also flawed by his misapplication of the governing law to the facts of the case.

Thus:

- Regarding the June 22, 2010 stop of the vehicle driving by Bennie Whigham, the judge found that the one-day period between the use of the GPS tracker to locate the vehicle driven by Eric Powell and the stop rendered "the time factor" at best "neutral." In fact, the cases which hold that a time interval sufficient to dissipate taint speak of periods of "substantial periods of time," United States v. Ceccolini, 435 US 268, 279 (1978) not mere hours, *see, e.g.,* United States v. Gross, 662 F3d at 402 ("Gross's voluntary confession occurred approximately two months later").

- In addition the judge's finding that "the agents' conduct in connection with the Whigham stop was not flagrant" ignores the "purpose" aspect of the "the purpose and flagrancy of the official misconduct" factor identified in *Gross.* As this Court explained in United States v. Shaw, 464 F3d 615, 631 (6th Cir 2006) "the requisite "quality of purposefulness" can be demonstrated when the arrest, in design and execution, is investigatory in nature."

- As to the September 17, 2010 stop of the vehicle driven by Earnest Proge, the record reflects that the vehicle initially *did* stop when signaled to do so, thus rendering the seizure complete, and that Mr. Proge only attempted to flee when he was being "interview[ed] by the State Trooper who had stopped him. (RE 176, Transcript, Page ID 1435-1436). This fact takes the case out

46

of the reach of <u>United</u> <u>States</u> <u>v.</u> <u>Beauchamp</u>, *supra,* on which the judge relied, and aligns it with decisions such as <u>United</u> <u>States</u> <u>v.</u> <u>Brown</u>, 448 F3d 239, 252 (3d Cir 2006), where the fact that the defendant "was seized before his aborted escape attempt," so that evidence obtained thereafter would be inadmissible. [6]

---

[6] *See also,* <u>United</u> <u>States</u> <u>v.</u> <u>Dupree</u>, 617 F3d 724, 736 (3rd Cir 2010), and authorities there cited (discussing "evidence discarded by a defendant during flight from an encounter with the police that constituted an unlawful show-of-authority seizure," and concluding that "[m]ost courts have suppressed such evidence as fruit of the poisonous tree.")

In short, the judge's findings are inconsistent with the factual record and the governing law, and will not support the admissibility of the challenged evidence.

Because each ruling of the judge erred in denying each aspect of Defendant's motion to suppress, this Court should reverse those rulings. Because the evidence acquired through the challenged electronic surveillance was patently crucial to the government's case against Defendant, this Court should also reverse his convictions and sentences.

**II      THE ADMISSION OF EVIDENCE ACQUIRED BY POLE CAMERAS, AND EVIDENCE DERIVED THEREFROM, VIOLATED DEFENDANT'S FOURTH AMENDMENT RIGHTS.**

> **Standard of Review: "When reviewing the denial of a motion to suppress, we review the district court's findings of fact for clear error and its conclusions of law de novo." United States v. Johnson, 656 F3d 375, 377 (6th Cir 2011) (citation, quotations omitted).**

Prior to trial, the Defendant challenged the admissibility of evidence acquired by the operation of a number of "pole cameras" installed on utility poles owned and operated by DTE Energy pursuant to Orders issued under the purported authority of the All Writs Act, 28 U.S.C. § 1651, each allowing continuous video surveillance for periods of up to 90 days. (RE 145, Motion, Pg ID 1053-1070). None of the applications sought to show, and none of the Orders found, that there was probable cause to believe that the operation of the pole cameras would produce evidence of crime.

There were four such installations in all, but evidence acquired by or derived from only three of the locations was introduced at trial: residential premises as 20109 Conley, Detroit, Michigan and 15765 Stricker, Eastpointe, Michigan, and a commercial property at 24300 Sherwood, Centerline, Michigan.

The underlying facts were presented to the district court by uncontested proffers of the parties, at a hearing held April 15, 2013, accompanied by photographs and videos from the cameras themselves. (RE 489, Transcript, Page ID 4131-4161).

Ultimately, the trial judge concluded that "the question here is whether the pole cameras observed any area protected by the Fourth Amendment under traditional observation and search principles." (RE 210, Opinion, Page ID 1678). Concluding that they did not, the judge denied the motion *in toto*.

Each of the video cameras was located on an elevated utility pole, and each had the ability to pan and zoom. (RE 489, Transcript, Page ID 4132, 4135, 4159). The cameras could be accessed remotely, through an internet connection, and the video images they captured could be viewed by the agents monitoring them in real time, or as recording. *Id* at Page ID # 4135.

In some instances, the placement of the cameras allowed the investigators to peer into areas within the curtilage of a dwelling. By way of illustration, below is a screenshot of a surveillance video made at the single-family home located at 20109 Conley, Detroit, which was included in Defendant's motion to suppress the pole camera evidence, (RE 145, Motion, Page ID 1053-1070), and which shows how the elevated camera was able to afford a view inside the rear fence of the premises:



Also for illustration, below is a screenshot from a surveillance video taken at the single-family home located at 15765 Stricker, Eastpointe. Here the camera's view was up the house's driveway, but its perspective was such as to allow a view of some activities which would not have been visible from street level:



Finally, below is a screenshot of surveillance video taken at the commercial premises located at 24300 Sherwood, Centerline. Here, the camera looked over into a common or forecourt area which was not visible from the street, and although it did not look directly into the interior of the premises, was able to capture portions of the interior, and people going in and out; like all the cameras, it had the ability to rotate and zoom, affording the agents a variety of views:

52



The trial judge's conclusion that the cameras did not infringe on legitimate expectations of privacy hinged on his observation that it would have been possible for a person situated in a public place to make the same observations:

**15765 Stricker**:

"While the view is elevated, there are no obstructions the camera looks over, and an examination of photographs of the area show the driveway was open and accessible to the public view. Nothing the camera viewed could not have been viewed publically."

**20109 Conley**:

"This is not a case of a camera peering over a solid fence where the public could not otherwise see, but a case of a camera positioned looking over a semi-visible fence to a location where the public could easily see from another vantage point. The fence itself is half-solid, with the upper half being a lattice array which would not have obstructed the view of people or vehicles coming and going.

Moreover, the portions of the driveway observed would have been visible from other vantage points, not merely the pole camera. An examination of the lines of sight of the exhibit photos reveals that the portions of the driveway observed would be clearly visible to the public view from either the main street, or the houses next door."

**24300 Sherwood**:

"While Defendants argue the common yard was enclosed by other buildings and not visible to the public, examination of the camera footage and photographs of the building reveals the property and common yard was open to many directions and surrounded by roads and alleyways. Nor were there fences or other obstructions preventing any person from observing the Defendants' comings and goings."
(RE 210, Order, Page ID 1681-1682) (citations omitted).

The judge's rigid distinctions based on physical location founder, however, on modern Fourth Amendment jurisprudence. Thus, as discussed previously, in United States v. Jones, *supra*, a plurality of the Court held that the Fourth Amendment was violated by a 28-day period of warrantless electronic monitoring of a subject's movements taking place *entirely on public streets.* As the Jones plurality recognized, it is the intensity and duration of the electronic surveillance enabled by contemporary technology - constant, long-term, secret, unobservable, and persistent - which triggers

54

Fourth Amendment interests here, even where the activities might, from time to time, or on particular occasions, be thought to have been conducted "in public." And those interests were surely implicated - and violated - here, where the pole cameras authorized continuous, 90-day periods of observation, without any of the kinds of judicial findings required by the Fourth Amendment.

It is, of course, the technology involved that tips the scales. While it is certainly true that the agents could have shinnied up poles, climbed on roofs, or hidden behind bushes in neighbors' yards, and so have been, at least theoretically, in a position to see what the pole cameras did, it is inconceivable, as a practical matter, that they would have done so (or been able to do so) every minute of every day for the periods of time involved here - six months, for example, in the case of the Conley Street house. Their use of the pole cameras, however, eliminated the practical constraints, and allowed an intensive level of observation which, it must ve concluded, crossed the line defining reasonable expectations of privacy.

Indeed, while declining to rule definitively on the issue, in an unpublished opinion in United States v. Anderson-Bagshaw, 509 Fed App 396, 405 (6th Cir. 2012), the Sixth Circuit noted that "[f]ew people, it seems, would expect that the government can constantly film their backyard for over three weeks using a secret camera that can pan and zoom and stream a live image to government agents."

To this observation, the <u>Anderson-Bagshaw</u> panel added: "We are inclined to agree with the Fifth Circuit that "[t]his type of surveillance provokes an immediate negative visceral reaction." <u>United</u> <u>States</u> <u>v.</u> <u>Cuevas-Sanchez</u>, 821 F2d 248, 251 (5th Cir 1987) (stating in dicta that using a pole camera to view curtilage over a 10-foot fence constitutes a Fourth Amendment search). "

The Court should hold that the use of the pole cameras constituted a Fourth Amendment violation, and should remand the case with instructions to determine the degree to which this violation tainted the searches and seizures which followed.

## CONCLUSION

The Court should hold that the trap-and-trace orders did not properly authorize the acquisition of autonomous or location data, that the good faith exception to the exclusionary rule cannot be applied to allow the admission of evidence acquired through the cell-site/GPS warrants, that the long-term warrantless employment of the GPS tracking devises was improper, and that these illegalities fatally tainted the four vehicle searches to which they led. The importance of this evidence requires reversal of Defendant's convictions, but the Court should leave it to the trial court to decide in the first instance the question of taint as to the search warrants subsequently issued, for purposes of any further proceedings.

The Court should hold that the long-term employment of the pole cameras, without benefit of showings or findings of probable cause, constituted a Fourth Amendment violation. The questions of derivative illegality should be left to the trial court in the first instance.

Respectfully submitted,
s/ Domnick J. Sorise
645 Griswold Street, Suite 1717
Detroit, Michigan  48226
(313) 967-0100
Fax: 313-967-0199
E-Mail: dsorise@sbcglobal.net
Michigan State Bar No. 25622

DATED: April 30, 2015

# CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a)(7)(C), Federal Rules of Appellate Procedure, the undersigned certifies that this brief complies with the type-volume limitations of Rule 32(a)(7)(B), Federal Rules of Appellate Procedure.

The brief contains a total 13,192 words, exclusive of the Table of Contents, Table of Authorities, Statement in Support of Oral Argument, and a Certificate of Compliance. It has been prepared, and this word count generated, using WordPerfectX6. The typeface is 14pt Times New Roman.

s/ Domnick J. Sorise
645 Griswold, Suite 1717
Detroit, Michigan 48226
(313) 967-0100
Fax: 313-967-0199
E-mail: dsorise@sbcglobal.net
Michigan Bar No. 25622

# ADDENDUM

# DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS

| Record Entry | Description | Pg ID Range |
|---|---|---|
| 3 | Indictment | 7-27 |
| 74 | Motion to Suppress/Evidentiary Hearing | 158-185 |
| 74-1 to 74-15 | Exhibits | 186-657 |
| 106 | Supplemental Brief (Motion #74) | 793-798 |
| 106-1 | Exhibits | 799-812 |
| 114 | Government Response (Motion #74) | 846-886 |
| 127 | Reply (Motion #74) | 924-938 |
| 145 | Motion to Suppress-Pole Cameras | 1053-1070 |
| 145-1 | Exhibits | 1071-1121 |
| 159 | Supplement (Motion #74) | 1166-1170 |
| 160 | Government Response-Pole Cameras | 1171-1188 |
| 160-1 to 160-5 | Exhibits | 1189-1208 |
| 167 | Opinion and Order (Pen/Trap) | 1265-1280 |
| 168 | Reply-Pole Cameras | 1281-1285 |
| 171 | Superceding Indictment | 1288-1313 |
| 176 | Transcript-Evidentiary Hearing Vol 1 | 1378-1464 |
| 202 | Opinion and Order (Motion #74) | 1590-1647 |
| 210 | Opinion and Order-Pole Cameras | 1670-1684 |
| 287 | Transcript/Pretrial April 10, 2014 | 2174-2204 |
| 296 | Transcript-Evidentiary Hearing Vol 2 | 2243-2342 |

| | | |
|---|---|---|
| 299 | Motion to Dismiss Counts 11, 12, 13, and 14 | 2243-2204 |
| 300 | Gov. Motion to Dismiss Counts 11, 12, 13, 14 | 2377-2379 |
| 356 | Order Granting Motion to Dismiss Counts | 2746-2747 |
| 470 | Judgment | 4018-4024 |
| 473 | Notice of Appeal | 4028-4029 |
| 489 | Transcript-Evidentiary Hearing-Pole Cameras | 4121-4176 |
| 490 | Transcript/Pretrial March 26, 2014 | 4177-4216 |
| 491 | Trial Transcript Vol 2 | 4217-4379 |
| 492 | Trial Transcript Vol 3 | 4380-4545 |
| 493 | Trial Transcript Vol 4 | 4546-4644 |
| 494 | Trial Transcript Vol 5 | 4645-4807 |
| 495 | Trial Transcript Vol 6 | 4808-5011 |
| 496 | Trial Transcript Vol 7 | 5012-5192 |
| 497 | Trial Transcript Vol 8 | 5193-5379 |
| 498 | Trial Transcript Vol 9 | 5380-5410 |
| 500 | Sentence Transcript | 5443-5473 |

# CERTIFICATE OF SERVICE

I hereby certify that on April 30, 2015, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system, which will send notification of such filing to the following:

Steven P. Cares
Assistant United States Attorney
211 W. Fort Street, Suite 2001
Detroit, Michigan 48226
(313) 226-9139
Steven.cares@usdoj.gov

s/ Domnick J. Sorise
645 Griswold, Suite 1717
Detroit, Michigan 48226
(313) 967-0100
Fax: 313-967-0199
E-mail: dsorise@sbcglobal.net
Michigan Bar No. 25622