IN THE UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

NOS. 14-2506(I ), 14-2507(con)

RECEIVED
MAR 1 0 2017
DEBORAH S. HUNT, Clerk

TENDERED
FOR FILING
MAR 1 0 2017
DEBORAH S. HUNT, Clerk

FILED
JUL 1 2 2017
DEBORAH S. HUNT, Clerk

UNITED STATES OF AMERICA,
Appellee,

VS.

CARLOS POWELL, ERIC POWELL,
Appellants.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PETITION FOR REHEARING AND REHEARING EN BANC
FOR APPELLANT'S CARLOS POWELL AND ERIC POWELL

## INTRODUCTION

Pursuant to the Federal Rules of Appellate procedure, the Appellant's, Carlos Powell and Eric Powell, presents that rehearing and rehearing en banc is necessary since the Panel's decision overlooks that the Supreme Court's decision in, United States v. Jones, 132 S.Ct. 945 (2012), is the controlling authority for direct appeal purposes on the warrantless-GPS-monitoring issue, and not this Circuit's decision in, United States v. Fisher, 745 F.3d 200 (6th Cir. 2014), decided after Jones, and expands Jones's holding beyond and outside of that established by the Supreme Court. In addition, the Panel failed to recognize that Appellants' Dale (United States v. Dale, 178 F.3d 429 (6th Cir. 1999), and Apprendi/Alleyne, error claim had merit and warranted appellate relief because, although, as the Panel concluded, the jury did find that the conspiracy involved cocaine and heroin, two of the three alleged objects of the conspiracy, the special verdict form did not provide an option for the finding of marijuana as the conspiracy's object, where marijuana was alleged as one of the objects, and which the trial evidence established was the initial/original narcotic involved in the conspiracy. Indeed,

excluding marijuana from the special verdict form effectively removed marijuana as a consideration and finding by the jury, and thus directed the verdict on cocaine and heroin only, a substantial due proces jury trial violation that affected Appellant's sentencing exposure, both the minimum and maximum.

Alternatively, because the Panel's decision cannot be reconciled with the observance of Appellants' substantive due process rights, violation of which this Court has consistently admonished and corrected where found, rehearing en banc is necessary less the violation in this instance, goes uncorrected.

## PETITION FOR REHEARING

### Standing For Rehearing

THE PANEL FAILED TO APPLY JONES TO APPELLANT'S CASE ON DIRECT APPEAL AND/OR EXPANDED JONES'S HOLDING BEYOND THAT ESTABLISHED BY JONES ON THE UNCONSTITUTIONALITY OF THE WARRANTLESS INSTALLATION AND TRACKING OF A WIRELESS–GPS–MONITORING DEVICE.

The Panel failed to apply the controlling Supreme Court decision, in United States v. Jones, 132 S.Ct. 945 (2012), to Appellant's case on direct appeal, and alternatively applied the Circuit precedence of United States v. Fisher, 745 F.3d 200 (6th Cir. 2014), which held that where the agent(s) illegal actions in installing a warrantless GPS monitoring device on the accused's vehicle is done with the belief––"good faith"––that the agent(s)' actions are legal in accordance with "binding Circuit precedence," then the agents(s)' illegal actions are categorically excussed and no suppression/exclusion of any evidence obtained as a result will be had.

Here, first, the Jones Court did not hold (or even reach the question) that a warrantless installation and tracking of a wireless GPS device, and it's illegality and unconstitutionality, can be excusable based upon a good faith belief of the violating agent that his conduct is legal at the time. Id. at 201. Indeed, the Jones Court's holding unequivically made clear that the warrantless use of a GPS tracking device violated the Fourth Amendment's search and seizure clause, and that any evidence obtained against the accused as a result must be suppressed/ excluded. Id. 132 S.Ct. at 948-51. Here, the Panel's use of Fisher's "good faith" doctrine expands Jones's holding beyond that established by the Supreme Court to create an exemption, an excuse, and harmless error escapage to a warrantless installment of a wireless GPS tracking and monitoring device, a doctrine, analysis,

and rule the Jones Court did not reach. Thus, the Panel was required to adhere strictly to the limited holding established in Jones and apply that plain holding to Appellant's case on direct appeal, regardless of the intervening Circuit precedence in Fisher, which did not and could not overrule Jones.

Then, the Panel's "good faith" theory to affirm the district court's failure to suppress/excluded the incriminating evidence obtained as a result of the warrantless installation of the GPS device here, was a theory not considered by the district court below or the basis of its denial to suppress. As well, the Government did not argue or present the "good faith" doctrine (exemption/excuse) in its argument for non-suppression/exclusion in the district court. Thus the Government waived the good faith doctrine/exemption on appeal, and the Panel should not have employed the alternative theory/doctrine for the first time on direct appeal, less Appellant's due process rights are infringed.

THE PANEL'S DECISION, IN DENYING APPELLANT'S DALE AND APPRENDI/ALLEYNE CLAIM, OVERLOOKED THAT THE SPECIAL VERDICT FORM EXCLUDED MARIJUANA AS A FINDING AS TO THE OBJECT OF THE CONSPIRACY, AND THUS EFFECTED A DIRECTED VERDICT FOR THE MORE SERIOUS NARCOTICS (HEROIN AND COCAINE) ALLEGEDLY INVOLVED IN THE CONSPIRACY.

In his pro se supplemental brief, the Appellant claimed that there was a sentencing error under Apprendi and Alleyne (530 U.S. 466 (2000) and 133 S.Ct. 2151 (2013), respectively), and this Court's decision in United states v. Dale, 178 F.3d 429 (6th Cir. 1999), in which this Court held that "when an indictment charges a defendant with a multiple-object conspiracy and the jury is instructed to agree unanimously as to whether one drug or both drugs referred to in the indictment are the objects of the conspiracy, the defendant must be sentenced as if the conspiracy involved only the drug with the lower penalty when the jury returns a verdict not specifying the substance found." Thus Appellant here argued Dale and Apprendi/Alleyne (holding that factors not found by the jury that increases the defendant's statutory maximum and minimum sentence exposure violates the defendant's due process and Sixth Amendment jury trial rights) prevented his sentence from exceeding the five-year maximum for conspiracy involving an unspecified quantity of marijuana where the jury did not unanimously determine which of the three drugs: marijuana, cocaine or heroin, or all three, was the object of the conspiracy.

In denying Appellant's sentencing error claim, the Panel concluded that Dale does not apply in the instant case because the jury returned a verdict

specifically finding that the drug conspiracy involved a least five kilograms of cocaine and at least one kilogram of heroin. (United States v. Powell, No. 14-2506/2507/15-1724, Slip Op. at 26 (2/6/16)). However, the Panel failed to observe that the jury was prevented from considering and finding the marijuana as the object of the conspiracy because the special verdict form excluded marijuana completely from the verdict as an alternative to the cocaine and heroin. The exclusion of marijuana as the object of the conspiracy effectively directed the verdict on cocaine and heroin only, and thus violated Appellant's due process and jury trial rights. Accordingly, Appellant's sentencing error claim was meritous, was substantive, and warranted relief, whether under Dale, Apprendi/ Alleyne, or simply the due process clause of the Fifth Amendment, an error which the Panel should have noticed in its adjudication of Appellant's jury verdict claim here. (See Copy of Special Verdict Form, attached hereto as Exhibit 1).

PETITION FOR REHEARING EN BANC

## Standing For Rehearing En Banc

REHEARING IS NECESSARY, WITH RESPECT TO THE PANEL'S DECISION DENYING APPELLANT'S CLAIM ON THE WARRANTLESS INSTALLATION AND TRACKING OF THE GPS MONITORING DEVICE, BECAUSE THE PANEL'S DECISION EXPANDS THE SUPREME COURT'S HOLDING ON THE ISSUE, IN JONES, TO INCLUDE A "GOOD FAITH" EXCEPTION TO THE WARRANT REQUIREMENT FOR GPS INSTALLMENT AND USE—BUT WHERE THE JONES COURT DID NOT CONSIDER OR ESTAB-LISH SUCH AN EXCEPTION—AND READING INTO JONES A HARMLESS ERROR ANALYSIS WHERE THE SUPREME COURT DID NO SUCH THING.

The Panel's decision on the warrantless GPS use, affirming the warrantless installation and tracking in Appellant's case, and its reliance on this Circuit's holding in United States v. Fisher, 745 F.3d 200 (6th Cir. 2014), conflicts, or creates significant tension, with the Supreme Court's decision in United States v. Jones, 132 S.Ct. 945 (2012), the controlling law on the issue and direct appeal. Specifically, the Supreme Court held that the warrantless use of a GPS tracking device, was an intrusion that violated the Fourth Amendment's search and seizure clause, and that any evidence (fruits) obtained therefrom must be supressed/excluded. Id. at 132 S.Ct. 948-51. There was no consideration by the Jones Court, or establishment, of an exception to the warrant requirement for a valid and legal installation and use of a GPS device. In otherwords, the Supreme Court did not establish any "good faith" exception, qualified immunity, or any other harmless error based exemption amenable to the suppression/exclusion

rule for GPS Fourth Amendment violation.

However, using the Circuit's intervening decision in Fisher, the Panel applied a "good faith" exception to the agents' warrantless installation of the GPS and tracking in Appellant's case. In Fisher, the same as in the instant case, agents there installed a warrantless GPS monitoring device, tracked the accused's many incriminating locations and conduct, and secured his conviction thereon. Prior to trial, the district court had denied the accused's motion to suppress/exclude the evidence obtained from the warrantless GPS use, and on appeal, a panel of this Court affirmed, holding that because the agents acted upon the belief that their actions were legal in accordance with "binding Circuit precedence," then the agents' acted in "good faith", which exempted the resulting incriminating evidence from suppression/exclusion. Thus, based upon Fisher, the Panel in the instant case, affirmed the district court's denial of Appellant's suppression and exclusionary motion based on the Fisher Panel's "good faith" exception theory. But, as explained, Jones was and is the controlling law on the warrantless GPS use issue, and the Supreme Court did not establish an exception, good faith or otherwise, to a warrantless GPS Fourth Amendment violation. The Jones Court mandated suppression and exclusion of the evidence obtained from such a violation, period. And hence, the Panel's decision here, applying a "good faith" exception to the clear warrantless GPS Fourth Amendment violation, to affirm the denial of suppression/exclusion of the ill-gotten fruits/evidence, unconstitutionally expands Jones beyond that which the Supreme Court established on the issue.

Alternatively, the Panel's "good faith" theory here was a theory not raised in the district court below or the basis of its denial of Appellant's motion to suppress/exclude the incriminating evidence obtained from the warrantless GPS use. The inception of this new theory on appeal to affirm the district court's denial of Appellant's motion to suprees/exclusion, violates Appellant's due process rights. See e.g., Yates v. Evatt, 500 U.S. 391 (1981); McCormick v. United, States, 500 U.S.___, 114 L.Ed.2d 307 (1991), holding that a higher court cannot affirm a conviction on a legal and/or factual theory never tried before a jury. Yates, 500 U.S. 391. "In a criminal case, a defendant is constitutionally entitled to have the issue of criminal liability determined by the jury in the first instance; appellate courts are not permitted to affirm convictions on any theory they please...the Supreme Court has never held that the right to a jury trial is satisfied when an appellate court retries a case on appeal under different

instructions and on a different theory than was ever presented to th jury."
McCormick, 114 L.Ed.2d at 314, 324 n.8.

CONCLUSION

Wherefore, rehearing and rehearing by the full Court en banc is warranted
to correct the unconstitutional expansion of the Jones Court holding on war-
rantles GPS use, to strike the Panel's new "good faith" theory on direct ap-
peal, for the first time, and to consider the factual record of the special
verdict form, which removed marijuana as an object of the conspiracy, in keep-
ing with the Appellant's due process rights in the instant appeal.

Respectfully submitted,

Carlos Powell, Appellant
Reg. No. 46705-039
USP-Allenwood
P.O. BOX 3000
White Deer, PA 17887

Eric Powell, Appellant
Reg. No. 46097-039
USP-Lee County
P.O. 305
Jonesville, VA 24263

CERTIFICATE OF SERVICE

I HEREBY CERTIFY, that a true and correct copy of the foregoing, pro se peti-
tion for Rehearing and Rehearing En Banc, was served, this full 16th day of Feb-
bruary, 2017, via first-class U.S. Postal Mail, on the following parties:

Andrew Goetz, AUSA
U.S. Attorney's Office
000 211 W. Fort Street, Suite 2001
Detroit, Michigan

N.C. Deday LaRene & Kriger
Counsel for Appellant Carlos Powell
645 Griswold Street, Suite 1717
Detroit, Michigan

Domnick J. Sorise
Counsel for Appellant Eric Powell
00 645 Griswold Street, Suite 1717
Detroit, Michigan

# EXHIBIT 1



F I L E D

MAY 1 5 2014

CLERK'S OFFICE
U.S. DISTRICT COURT
EASTERN MICHIGAN

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

UNITED STATES OF AMERICA,

                **Plaintiff,**

v.

CARLOS POWELL, et al,

                **Defendants,**

_____/

CRIMINAL NO. 12-20052-01,02,04,05

## VERDICT FORM

## <u>VERDICT FORM</u>

**We, the jury, unanimously find the following:**

<u>COUNT ONE (Carlos Powell)</u>

Question 1. With respect to the charge in Count One of the indictment for conspiracy to possession with intent to distribute and to distribute heroin, cocaine, and marijuana, we find the defendant Carlos Powell:

Not Guilty _____          Guilty ⟋X⟍

If you answered guilty in response to Question 1, proceed to Question 1(a). If you answered not guilty in response to Question 1, skip Question 1(a) and proceed to Question 2.

Question 1(a). With respect to Count One, the amount of the mixture or substance containing a detectable amount of heroin/cocaine involved in the conspiracy as a whole was (check largest quantity that you find for each substance):

Heroin
    **X**___1000 grams (1 kilogram) or more
    _____100 grams or more but less than 1000 grams (1 kilogram)
    _____less than 100 grams
    _____none

Cocaine
    **X**___5000 grams (5 kilograms) or more
    _____500 grams or more but less than 5000 grams (5 kilograms)
    _____less than 500 grams
    _____none

COUNT ONE (Eric Powell)

Question 2. With respect to the charge in Count One of the indictment for conspiracy to possession with intent to distribute and to distribute heroin, cocaine, and marijuana, we find the defendant Eric Powell:

Not Guilty _____          Guilty ⤬___

If you answered guilty in response to Question 2, proceed to Question 2(a). If you answered not guilty in response to Question 2, skip Question 2(a) and proceed to Question 3.

Question 2(a). With respect to Count One, the amount of the mixture or substance containing a detectable amount of heroin/cocaine involved in the conspiracy as a whole was (check largest quantity that you find for each substance):

Heroin
   _⤬___1000 grams (1 kilogram) or more
   _____100 grams or more but less than 1000 grams (1 kilogram)
   _____ less than 100 grams
   _____ none

Cocaine
   _⤬__5000 grams (5 kilograms) or more
   _____500 grams or more but less than 5000 grams (5 kilograms)
   _____ less than 500 grams
   _____ none

## COUNT ONE (Earnest Proge)

Question 3. With respect to the charge in Count One of the indictment for conspiracy to possession with intent to distribute and to distribute heroin, cocaine, and marijuana, we find the defendant Earnest Proge:

Not Guilty _____                    Guilty  ✗

If you answered guilty in response to Question 3, proceed to Question 3(a). If you answered not guilty in response to Question 3, skip Question 3(a) and proceed to Question 4 (the next count).

Question 3(a). With respect to Count One, the amount of the mixture or substance containing a detectable amount of heroin/cocaine involved in the conspiracy as a whole was (check largest quantity that you find for each substance):

Heroin
   ✗___1000 grams (1 kilogram) or more
   _____100 grams or more but less than 1000 grams (1 kilogram)
   _____ less than 100 grams
   _____ none

Cocaine
   ✗___5000 grams (5 kilograms) or more
   _____500 grams or more but less than 5000 grams (5 kilograms)
   _____ less than 500 grams
   _____ none

## COUNT TWO (Eric Powell)

Question 4. With respect to the charge in Count Two of the indictment for possession with intent to distribute heroin, we find the defendant Eric Powell:

Not Guilty _____          Guilty _X_

If you answered guilty in response to Question 4, proceed to Question 4(a). If you answered not guilty in response to Question 4, skip Question 4(a) and proceed to Question 5.

Question 4(a). With respect to Count Two, the amount of the mixture or substance containing a detectable amount of heroin involved in the conspiracy as a whole was (check largest quantity that you find):

Heroin
_X_ 1000 grams (1 kilogram) or more
_____ 100 grams or more but less than 1000 grams (1 kilogram)
_____ less than 100 grams


## COUNT TWO (Earnest Proge)

Question 5. With respect to the charge in Count Two of the indictment for possession with intent to distribute heroin, we find the defendant Earnest Proge:

Not Guilty _____          Guilty _X_

If you answered guilty in response to Question 5, proceed to Question 5(a). If you answered not guilty in response to Question 5, skip Question 5(a) and proceed to Question 6 (next count_.

Question 5(a). With respect to Count Two, the amount of the mixture or substance containing a detectable amount of heroin involved in the conspiracy as a whole was (check largest quantity that you find):

Heroin
_X_ 1000 grams (1 kilogram) or more
_____ 100 grams or more but less than 1000 grams (1 kilogram)
_____ less than 100 grams

## COUNT THREE (Carlos Powell)

Question 6. With respect to the charge in Count Three of the indictment for possession with intent to distribute cocaine, we find the defendant Carlos Powell:

Not Guilty _____                    Guilty _X̸_

If you answered guilty in response to Question 6, proceed to Question 6(a). If you answered not guilty in response to Question 6, skip Question 6(a) and proceed to Question 7.

Question 6(a). With respect to Count Three, the amount of the mixture or substance containing a detectable amount of cocaine involved in the conspiracy as a whole was (check largest quantity that you find):

Cocaine
_X̸_ 5000 grams (5 kilograms) or more
_____500 grams or more but less than 5000 grams (5 kilograms)
_____ less than 500 grams

## COUNT THREE (Eric Powell)

Question 7. With respect to the charge in Count Three of the indictment for possession with intent to distribute cocaine, we find the defendant Eric Powell:

Not Guilty _____                    Guilty _X̸_

If you answered guilty in response to Question 7, proceed to Question 7(a). If you answered not guilty in response to Question 7, skip Question 7(a) and proceed to Question 8.

Question 7(a). With respect to Count Three, the amount of the mixture or substance containing a detectable amount of cocaine involved in the conspiracy as a whole was (check largest quantity that you find):

Cocaine
_X̸_ 5000 grams (5 kilograms) or more
_____500 grams or more but less than 5000 grams (5 kilograms)
_____ less than 500 grams

## COUNT THREE (Earnest Proge)

Question 8. With respect to the charge in Count Three of the indictment for possession with intent to distribute cocaine, we find the defendant Earnest Proge:

Not Guilty  X          Guilty _____

If you answered guilty in response to Question 8, proceed to Question 8(a). If you answered not guilty in response to Question 8, skip Question 8(a) and proceed to Question 9 (next count).

Question 8(a). With respect to Count Three, the amount of the mixture or substance containing a detectable amount of cocaine involved in the conspiracy as a whole was (check largest quantity that you find):

Cocaine

_____5000 grams (5 kilograms) or more

_____500 grams or more but less than 5000 grams (5 kilograms)

_____ less than 500 grams


## COUNT FOUR (Carlos Powell)

Question 9. With respect to the charge in Count Four of the indictment for possession with intent to distribute heroin, we find the defendant Carlos Powell:

Not Guilty _____          Guilty  X

If you answered guilty in response to Question 9, proceed to Question 9(a). If you answered not guilty in response to Question 9, skip Question 9(a) and proceed to Question 10 (next count).

Question 9(a). With respect to Count Four, the amount of the mixture or substance containing a detectable amount of heroin involved in the conspiracy as a whole was (check largest quantity that you find):

Heroin

__X__1000 grams (1 kilogram) or more

_____100 grams or more but less than 1000 grams (1 kilogram)

_____ less than 100 grams

## COUNT FOUR (Eric Powell)

Question 10. With respect to the charge in Count Four of the indictment for possession with intent to distribute heroin, we find the defendant Eric Powell:

Not Guilty _____          Guilty _____

If you answered guilty in response to Question 10, proceed to Question 10(a). If you answered not guilty in response to Question 10, skip Questions 10(a) and proceed to Question 11 (next count).

Question 4(a). With respect to Count Four, the amount of the mixture or substance containing a detectable amount of heroin involved in the conspiracy as a whole was (check largest quantity that you find):

Heroin
_____ 1000 grams (1 kilogram) or more
_____ 100 grams or more but less than 1000 grams (1 kilogram)
_____ less than 100 grams

## COUNT FIVE (Carlos Powell)

Question 11. With respect to the charge in Count Five of the indictment for possession of a firearm in furtherance of a drug trafficking crime (Count One - Conspiracy to Distribute Controlled Substances and/or Count Four - Possession with Intent to Distribute Heroin), we find the defendant Carlos Powell:

Not Guilty _____          Guilty __X__

Proceed to Question 12 (next count).

## COUNT EIGHT (Earnest Proge)

Question 12. With respect to the charge in Count Eight of the indictment for felon in possession of a firearm, we find the defendant Earnest Proge:

Not Guilty _____          Guilty __X__

Proceed to Question 13 (next count).

### COUNT TEN (Carlos Powell)

Question 13. With respect to the charge in Count Ten of the indictment for Conspiracy to Launder Monetary Instruments, we find the defendant Carlos Powell:

Not Guilty _____                    Guilty _X_

Proceed to Question 14.


### COUNT TEN (Eric Powell)

Question 14. With respect to the charge in Count Ten of the indictment for Conspiracy to Launder Monetary Instruments, we find the defendant Eric Powell:

Not Guilty _____                    Guilty _X_

Proceed to Question 15.


### COUNT TEN (Earnest Proge)

Question 13. With respect to the charge in Count Ten of the indictment for Conspiracy to Launder Monetary Instruments, we find the defendant Earnest Proge:

Not Guilty _____                    Guilty _X_

Proceed to Question 15.


### COUNT FIFTEEN (Kenneth Daniels)

Question 13. With respect to the charge in Count Fifteen of the indictment for Structuring Financial Transactions, we find the defendant Kenneth Daniels:

Not Guilty _____                    Guilty _X_

s/Jury Foreperson _____
In compliance with the Privacy Policy
adopted by the Judicial Conference, the
verdict form with the original signature
has been filed under seal.


Dated: _May 13, 2014_

Carlos Powell
Register No.: 46705-039
United States Penitentiary-Allenwood
Post Office Box: 3000
White DEER, PA 17887-3000
United States



MAILED FROM
U.S. PENITENTIARY

HAR 0 7 2017

Legal Mail

⇔46705-039⇔
Potter Steward
U.S. Courthouse,Room540
100 E 5TH ST
Cincinnati, OH 45202-3988
United States

RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 17a0025p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

CARLOS ELLIS POWELL (14-2506); ERIC JEROME POWELL (14-2507); EARNEST LEE PROGE (15-1724),
*Defendants-Appellants.*

Nos. 14-2506/2507/15-1724

---

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:12-cr-20052—Stephen J. Murphy III, District Judge.

Argued: August 3, 2016

Decided and Filed: February 6, 2017

Before: GUY, BOGGS, and MOORE, Circuit Judges

---

### COUNSEL

**ARGUED:** N.C. Deday LaRene, LARENE & KRIGER, P.L.C., Detroit, Michigan, for Appellant in 14-2506. Domnick J. Sorise, Detroit, Michigan, for Appellant in 14-2507. Kevin M. Carlson, UNIVERSITY OF MICHIGAN LAW SCHOOL, Ann Arbor, Michigan, for Appellant in 15-1724. Andrew Goetz, UNITED STATES ATTORNEY'S OFFICE, Detroit, Michigan, for Appellee. **ON BRIEF:** N.C. Deday LaRene, LARENE & KRIGER, P.L.C., Detroit, Michigan, for Appellant in 14-2506. Domnick J. Sorise, Detroit, Michigan, for Appellant in 14-2507. Kevin M. Carlson, Melissa M. Salinas, UNIVERSITY OF MICHIGAN LAW SCHOOL, Ann Arbor, Michigan, for Appellant in 15-1724. Andrew Goetz, UNITED STATES ATTORNEY'S OFFICE, Detroit, Michigan, for Appellee. Carlos Ellis Powell, White Deer, Pennsylvania, pro se.

GUY, J., delivered the opinion of the court in which BOGGS, J, joined, and MOORE, J., joined in part. MOORE, J. (pp. 28–36), delivered a separate opinion concurring in part and dissenting in part.

## OPINION

RALPH B. GUY, JR., Circuit Judge.    Defendants Carlos Powell, Eric Powell, and Earnest Proge, Jr., were tried together and convicted of offenses arising out of a large-scale narcotics distribution operation in Detroit, Michigan.[1]    First, all three defendants challenge the district court's orders denying their motions to suppress evidence derived from:    (1) the collection of cellular-phone identification and location information; (2) the use of a GPS tracking device; and (3) the monitoring of video cameras installed on nearby utility poles.    Second, raising Sixth Amendment claims, Carlos Powell argues that he was denied his right to represent himself, and Earnest Proge contends that he was denied counsel of his choice.    Third, Earnest Proge raises separate claims of error, including challenges to the sufficiency of the evidence, the jury instructions, and an error in the judgment entered against him.    Finally, Carlos Powell has raised additional claims in a *pro se* brief.    For the reasons that follow, we affirm the denial of the defendants' motions to suppress; affirm the judgments entered against Carlos and Eric Powell, respectively; and vacate the judgment and remand for further proceedings consistent with this opinion with respect to Earnest Proge only.

### I.

Overwhelming evidence established that Carlos Powell ran a lucrative narcotics distribution conspiracy and a related money-laundering conspiracy with his brother Eric Powell in Detroit, Michigan.    The Powells' drug operation largely evaded detection until a DEA investigation in Arizona snared a middleman named Ted Morawa.    Morawa had received large quantities of marijuana, cocaine, and heroin from Mexico and arranged or facilitated the transportation of drugs and cash to and from customers in the Midwest.    Morawa decided to cooperate with the government in early 2010, and the information he provided included identifying Carlos Powell, a/k/a "50," as his "number one" customer.    At trial, Morawa described meeting with Carlos Powell a number of times and arranging for large quantities of marijuana,

---

[1] Kenneth Daniels was also tried with these defendants, and his appeal was heard separately (No. 14-2242).

cocaine, and heroin to be transported to him beginning in 2006. The investigation that followed led to the charges in this case.

Starting in March 2010, DEA agents in Detroit gathered evidence by: obtaining warrants for prospective real-time cell-phone location data; using a cell-site simulator to identify unknown cell phones used by Carlos Powell, Eric Powell, and Juan Valle; placing a GPS tracking device on Eric Powell's Chevy Silverado pickup truck; and monitoring three video cameras installed on public utility poles. The evidence at trial included recordings from pole cameras installed near three "stash" locations: a house on Conley Street in Detroit, a house on Stricker Avenue in Eastpointe, and a warehouse on Sherwood Avenue in Center Line, Michigan.

The DEA's surveillance—electronic and in-person—led agents to request that the Michigan State Police make four traffic stops that resulted in the seizure of drugs and/or cash on June 23, June 28, September 17, and October 22, 2010. Defendants did not challenge the validity of the stops themselves, but argued that the evidence obtained as a result of those stops should be suppressed as fruit of earlier illegal searches or seizures.

On June 23, ten kilograms of heroin was seized from Benny Whigham's Volkswagen Passat when he was stopped as he returned from Chicago traveling in tandem with Eric Powell and Earnest Proge in Eric's Silverado. The three men had been under surveillance in Chicago, and both vehicles were followed back into Michigan before Whigham was stopped. On June 28, Juan Valle met Carlos Powell at the Conley Street location and Valle was seen putting something in his Nissan Murano before driving away. Valle was followed and stopped, and $259,000 in cash was found in a hidden compartment of the Nissan.

On September 17, $2.2 million in cash was seized from a Ford Flex driven by Earnest Proge. Earlier that day, Carlos and Eric Powell were observed at the Stricker Avenue location. After Carlos left, Eric came out wearing latex gloves and put three suitcases into a Ford Flex. Eric Powell drove the Flex to the warehouse on Sherwood Avenue, where he was joined by Proge and another man. Proge later drove away in the Flex, while Eric Powell and the other man followed in the Silverado. When the police stopped Proge, he acted very nervous, said he did not have his license, and drove away—narrowly missing an officer and leading police on a high-

speed chase—before he was finally stopped. The Silverado exited the highway after Proge was first stopped, and then sped away to follow the chase when Proge fled from the officers. Proge told the officers that there was a lot of cash in the car, but that he was only the driver. Officers seized three locked suitcases from the Flex that contained $2.2 million in cash, a drug ledger, and a newspaper article about a drug arrest. Carlos Powell's fingerprints were on the article, and Eric Powell's print was on the packaging.

On October 22, suitcases containing $2 million in cash, a ledger, and 12 kilograms of cocaine were seized from a Toyota driven by Margarita Lopez de Vallejo. She testified that she delivered drugs and transported money for a drug supplier named Paul Rodriguez. Several days before the stop, she delivered drugs to Eric Powell and then waited at a hotel in Ann Arbor. On the day of the stop, Eric Powell was followed from the Stricker Avenue location to the hotel, where Proge joined him and helped transfer the suitcases into a waiting Toyota. When de Vallejo left the hotel in the Toyota, she was followed and stopped by the Michigan State Police.

Finally, nine search warrants were executed on November 17, 2010. From the Stricker Avenue location alone, the DEA seized five kilograms of heroin, $5 million in cash, several loaded firearms, seven cell phones, money counters, drug ledgers, and digital scales. Searches of three residences—two belonging to Carlos Powell and one belonging to Eric Powell—resulted in the seizure of firearms, luxury cars, expensive jewelry, and a total of more than $3 million in cash. Also, two firearms were seized from Earnest Proge's residence. Again, defendants did not challenge the validity of those searches, but argued that the warrants were obtained with evidence derived from earlier unlawful searches or seizures.

The initial indictment was returned in January 2012, and motions to suppress evidence were filed in April and November 2012. In January 2013, fourteen defendants—including Carlos Powell, Eric Powell, and Earnest Proge, Jr.—were charged in a 29-count superseding indictment with various drug-trafficking, money-laundering, and firearm offenses. After extensive briefing and several evidentiary hearings, the district court denied defendants' motions to suppress for the reasons stated in the orders it entered on January 4, May 3, and July 23, 2013. Trial was scheduled to commence in February 2014, but a stipulated 60-day extension of the pretrial and trial dates was entered into in January 2014.

In February 2014, *pro se* documents were filed on behalf of Carlos Powell and Eric Powell asserting that they were "trust property" of the Moorish Science Temple of America and claiming to revoke their citizenship and terminate the district court's power. Those filings were stricken by the district court because they had "no legal authority, were not filed by Defendants' attorneys, and [did] not bear on this case." Referencing similar prior filings in a related matter, the district court cautioned that "any further such documents will be dealt with more severely."

During the final pretrial conference held on March 26, 2014, the district court severed the trial of three of the defendants and emphasized that trial of the remaining defendants would commence as scheduled on April 29, 2014. It was during this conference that Carlos Powell's retained counsel gave the first indication that his client wanted to represent himself. The district court offered to conduct the required inquiry then, or whenever counsel would like, and agreed to defense counsel's suggestion that the inquiry be made after he had a chance to talk with his client. Then Earnest Proge's retained counsel asked to make a record of her client's decision to reject the government's plea offer and stated that her client wanted new counsel. The district court questioned Proge about his decision to reject the plea offer, extended the time for Proge (or any of the defendants) to enter a guilty plea, and invited Proge's attorneys to file a motion to withdraw as counsel.

Carlos Powell's request to proceed *pro se* was heard and denied during the continued conference held on April 10. The government sought reconsideration of that ruling, asking that Powell be allowed to represent himself with the aid of standby counsel. Although the motion was denied, it resulted in an order that clarified the basis for the denial of Powell's request to represent himself. Earnest Proge's attorneys filed the anticipated motion to withdraw on April 3, representing that there had been a complete breakdown in the attorney-client relationship. The district court heard from Proge and his counsel during a hearing on April 16, and denied the motion in an order entered April 22. On reconsideration, the district court allowed only one of Proge's attorneys to withdraw and indicated that the other attorney could be appointed to represent him at trial. Trial proceeded as scheduled on April 29, 2014.

At the conclusion of the ten-day trial, but while the jury was still deliberating, Carlos Powell, Eric Powell, and Earnest Proge violated their bond and fled the jurisdiction. The jury

returned verdicts finding all three defendants guilty of conspiracy to possess with intent to distribute and to distribute heroin, cocaine, and marijuana (Count 1). The defendants were also convicted of possession with intent to distribute the following: one kilogram or more of heroin on June 23 (Eric Powell and Earnest Proge) (Count 2); five kilograms or more of cocaine on October 22 (Carlos and Eric Powell) (Count 3); and one kilogram or more of heroin on November 17 (Carlos Powell) (Count 4). Carlos Powell and Earnest Proge were convicted of possession of a firearm in furtherance of a drug-trafficking offense and being a felon in possession of a firearm, respectively (Counts 5 and 8). Finally, all three defendants were found guilty of conspiracy to launder the proceeds of the drug trafficking (Count 10). Other substantive money-laundering charges were dismissed before trial, and the jury acquitted Earnest Proge of the charge of possession with intent to distribute cocaine on October 22 (Count 3).[2]

The United States Marshal Service apprehended Eric Powell in Atlanta, Georgia, and arrested Carlos Powell and Earnest Proge within a few weeks of each other in St. Louis, Missouri. The defendants were returned to Michigan for sentencing. Carlos and Eric Powell received concurrent life sentences on the drug and money-laundering offenses, and Carlos Powell also received a consecutive five-year term of for the firearm conviction. Earnest Proge was sentenced to concurrent terms of imprisonment of 120, 240, and 360 months, but, as the government concedes, the judgment incorrectly stated that he had been found guilty on Count 3. These consolidated appeals followed.[3]

## II. Motions to Suppress Evidence

On appeal from the denial of a motion to suppress, "we review the district court's findings of fact for clear error and its conclusions of law *de novo*." *United States v. Hurst*, 228 F.3d 751, 756 (6th Cir. 2000). In doing so, the evidence must be considered "in the light most likely to support the district court's decision." *Id.* (quoting *United States v. Navarro-Camacho*,

---

[2]Daniels did not flee and was convicted of one count of structuring financial transactions to evade reporting requirements in connection with the purchase of a luxury car in the name of Carlos Powell (Count 15).

[3]The life sentences for Carlos and Eric Powell were announced at sentencing. Although the written judgment provided a twenty-year sentence to be served concurrently for Count 10, an oral sentence controls when it conflicts with the written sentence. *See United States v. Denny*, 653 F.3d 415, 421 (6th Cir. 2011); *United States v. Penson*, 526 F.3d 331, 334 (6th Cir. 2008).

186 F.3d 701, 705 (6th Cir. 1999)). For the reasons discussed, we affirm the district court's denial of the motions to suppress evidence.

## A.   Standing

The Fourth Amendment's exclusionary remedy "encompasses both the 'primary evidence obtained as a direct result of an illegal search or seizure' and, relevant here, 'evidence later discovered and found to be derivative of an illegality,' the so-called 'fruit of the poisonous tree.'" *Utah v. Streiff*, 136 S. Ct. 2056, 2061 (2016) (quoting *Segura v. United States*, 468 U.S. 796, 804 (1984)); *see also Wong Sun v. United States*, 371 U.S. 471, 488 (1963). However, because Fourth Amendment rights are personal, suppression of evidence as "the product of a Fourth Amendment violation can be successfully urged only by those whose rights were violated by the search itself, not by those who are aggrieved solely by the introduction of damaging evidence." *United States v. Padilla*, 508 U.S. 77, 81-82 (1993) (per curiam) ("Co-conspirators and codefendants have been accorded no special standing.").

The district court found that Carlos and Eric Powell had "standing" to assert the alleged Fourth Amendment violations by virtue of their co-ownership of the relevant phones, vehicles, and property, but that Earnest Proge did not. We assume, since the government does not argue otherwise, that the Powells may pursue the Fourth Amendment claims they press on appeal. Proge contends that he had standing to challenge his arrest on September 17 as the product of "evidence unlawfully gathered earlier that day" through use of the GPS device on Eric Powell's vehicle and video surveillance outside the Sherwood Avenue warehouse. Because we find that the district court did not err in denying the Powells' motions to suppress evidence—including evidence derived from the GPS tracking and the pole cameras—we need not decide whether Proge met his burden to establish standing to challenge his seizure as fruit of the poisonous tree. *See Rakas v. Illinois*, 439 U.S. 128, 130 n.1 (1978); *United States v. Smith*, 263 F.3d 571, 582 (6th Cir. 2001).

## B.   Cell-Phone Location Information

The government obtained five judicially authorized warrants between March 11 and October 5, 2010, which permitted the government to receive "real time" cell-phone location

information—including cell-site location information (CSLI) and GPS data—for six cell-phone numbers for periods of 30 or 45 days each. Each warrant required the cellular service provider to initiate a signal to the target cell phone and to report the cell phone's location to the DEA when requested. The first of the warrants sought real-time location information for a known cell-phone number subscribed to by Carlos Powell. The district court found that the affidavit in support of that warrant included "informant testimony, confirmed by independently verified evidence, that Carlos Powell was a major player in a drug trafficking ring in Detroit." *United States v. Powell*, 943 F. Supp. 2d 759, 782 (E.D. Mich. 2013). The affidavit stated that obtaining Carlos Powell's cell-phone location information would assist in finding him and identifying his associates, the locations used to store narcotics, and the assets derived from the narcotic sales. *Id.*

Importantly, the government does not ask us to decide whether the long-term tracking of cell phone location information in this case should be deemed a search for purposes of the Fourth Amendment. The possibility that it could constitute a search was suggested in *dicta* in *United States v. Skinner*, 690 F.3d 772, 780 (6th Cir. 2012) (holding short-term cell-phone tracking was not a search), *cert. denied*, 133 S. Ct. 2851 (2013), and was not resolved in *United States v. Carpenter*, 819 F.3d 880, 886-90 (6th Cir. 2016) (holding that request for *historical* CSLI information was not a search), *petition for cert. filed*, No. 16-402 (U.S. Sept. 26, 2016). Indeed, because the government took the precaution of securing warrants for cell-phone location information in this case, it is not necessary to decide that issue as long as there was either probable cause or the *Leon* good-faith exception applied.[4]

Probable cause supports a search warrant when the affidavit demonstrates "a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). The district court detailed the information in Agent Donovan's March 11 affidavit and concluded that it provided a substantial basis for the magistrate judge to find probable cause to issue the warrant "under traditional probable cause analysis." *Powell*,

---

[4]Three other circuits have also concluded that use of historical cell-phone location information is not a search. *See United States v. Graham*, 824 F.3d 421 (4th Cir. 2016) (en banc), *petitions for cert. filed*, Nos. 16-6308/6694 (U.S. Sept. 26, 2016; Oct. 27, 2016); *United States v. Davis*, 785 F.3d 498 (11th Cir.) (en banc), *cert. denied*, 136 S. Ct. 479 (2015); *United States v. Guerrero*, 768 F.3d 351 (5th Cir. 2014), *cert. denied*, 135 S. Ct. 1548 (2015).

943 F. Supp. 2d at 782. Also, despite finding that the affidavit would not satisfy its own newly articulated probable-cause standard, the district court denied defendants' motions to suppress because the DEA agents had relied on the judicially issued warrants in good faith. *Id.* at 775-84; *see also id.* at 780 (acknowledging that "no authoritative court has stated plainly that [the district court's proposed] showing is required"). As such, the first hurdle defendants face on appeal is the good-faith exception.

Because the purpose of the exclusionary rule is to deter Fourth Amendment violations, *Herring v. United States*, 555 U.S. 135, 140-41 (2009), courts will not suppress evidence "obtained in objectively reasonable reliance on a subsequently invalidated search warrant," *United States v. Leon*, 468 U.S. 897, 922 (1984). Asserting a *Franks* claim, defendants argued that the *Leon* good-faith exception should not apply because Agent Donovan intentionally or recklessly omitted material information from the affidavit he submitted in support of the March 11 warrant. *See id.* at 923 (citing *Franks v. Delaware*, 438 U.S. 154 (1978)). Defendants point specifically to the following statements from later affidavits submitted in support of other warrants: namely, that it is "common for individuals involved in narcotics trafficking to obtain cellular telephones in nominee or fictitious names to avoid detection by law enforcement" and to "very often maintain one cellular telephone to communicate with their close associates and/or drug suppliers and . . . a second, third, or even a fourth cellular telephone to communicate with customers, and/or outside associates." Defendants contend that these statements would have lessened the likelihood that Carlos Powell could be expected to use a cell phone subscribed to in his own name to conduct drug-related activities.

However, as the government aptly responds, this allegedly omitted information would not have been material to the magistrate judge's probable-cause determination. *See United States v. Rose*, 714 F.3d 362, 370 (6th Cir. 2013) (citing *Franks*, 438 U.S. at 171-72). The March 11 warrant was sought in order to determine Carlos Powell's location by tracking his personal cell phone. Whether Carlos had other cell phones (which he apparently did), or used those other cell phones to conduct drug-related business (which he apparently did), would not undermine the finding of probable cause to believe that Carlos Powell was involved in an ongoing drug-trafficking conspiracy and that following him would yield evidence of that conspiracy. Having

failed to make "a substantial preliminary showing" that would have entitled defendants to a *Franks* hearing, this claim cannot overcome the good-faith exception. *Franks*, 438 U.S. at 155.

Defendants also argue that the March 11 warrant was "overbroad" because it was based on probable cause to believe that the cell-phone location information would *lead* to evidence of a crime—not that the location information *itself* would be evidence of a crime. But, the warrant issued on a finding of probable cause to believe that evidence of drug trafficking would be found by tracking the location of Carlos Powell's cell phone. The district court rejected defendants' argument that the affidavit was so lacking in indicia of probable cause as to render reliance on it objectively unreasonable. *Powell*, 943 F. Supp. 2d at 783-84 (citing *Leon*, 468 U.S. at 914). Defendants' assertion that the warrant was "facially deficient" is equally unavailing. *See Leon*, 468 U.S. at 923 ("[A] warrant may be so facially deficient—*i.e.*, in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid."). The district court did not err in finding that evidence derived from the March 11 warrant was admissible at trial and did not taint the probable cause underlying the second and subsequent cell-phone location warrants.

## C.   Cell-Phone Identification Information

DEA agents obtained a series of pen-register/trap-and-trace orders between March 11 and November 4, 2010, which purported to authorize the use of a cell-site simulator device to detect and record cell-phone identification information (such as the phone number, serial number, or mobile equipment identifiers) for unknown cell phones that were being used by Carlos Powell, Eric Powell, and Juan Valle, respectively. Each of the applications requested authorization to use a cell-site simulator in the vicinity of the target individual in order to detect the radio signals autonomously transmitted by the target cell phone (and other cell phones in the area) to identify the phone to the network for authentication. That process would be repeated at different locations until the target cell-phone number was identified—here, that included the identification

of several prepaid cell phones subscribed to in fictitious names using a post office box address in California.[5]

Defendants assert that the identification information was obtained "illegally"—and therefore evidence derived from that information should be suppressed—because the use of a cell-site simulator to capture "autonomously" transmitted information could not be authorized under the pen-register/trap-and-trace statute. The statute, as amended, defines a "pen register" as "a device or process which records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, provided, however, that such information shall not include the contents of any communication." 18 U.S.C. § 3127(3); *see also* § 3127(1) (incorporating definitions from 18 U.S.C. § 2510). Defendants contend that this definition should be interpreted restrictively to include the recording or decoding of information only if it is transmitted *with* a wire or electronic communication (*i.e.*, only when sending a text or making a call). Whether the statute should be construed as defendants urge, however, is an issue of first impression that is immaterial to the suppression issue before us.

As the district court recognized, the exclusionary rule is not an available remedy for a statutory violation unless the Constitution requires it or the statute expressly provides for it. *See Carpenter*, 819 F.3d at 890 (citing *United States v. Abdi*, 463 F.3d 547, 556 (6th Cir. 2006)); *United States v. Page*, 232 F.3d 536, 541 (6th Cir. 2000). Defendants clarified in reply that they do not claim that the cell-phone identification information was obtained in violation of the Fourth Amendment. *See also Smith v. Maryland*, 442 U.S. 735, 745-46 (1979) (holding use of pen register to record dialed calls was not a search); *Carpenter*, 819 F.3d at 886-90 (holding collection of CSLI was not a search); *United States v. Bah*, 794 F.3d 617, 630-31 (6th Cir.), *cert. denied*, 136 S. Ct. 561 (2015) (holding officer's scan of magnetic strip on credit card for identifiers was not a search). Nor does the pen-register/trap-and-trace statute itself provide for the suppression of evidence as a remedy for its violation. *See United States v. Thompson*,

---

[5]Defendants also claimed that the DEA used the cell-site simulator to collect cell-phone *location* information without obtaining a warrant (*i.e.*, location tracking). However, the district court found no evidence that the DEA had done so, and defendants have not shown that the district court's finding in that regard was clearly erroneous.

936 F.2d 1249, 1250-51 (11th Cir. 1991) (holding suppression not available remedy for violation of 18 U.S.C. § 1321 *et seq.*). We agree with the district court that use of a cell-site simulator to identify the six unknown cell phones did not undermine the probable cause supporting the second and subsequent warrants for the cell-phone location information.[6]

### D.    Pre-*Jones* Warrantless GPS Vehicle Tracking

Defendants moved to suppress evidence derived from the warrantless GPS tracking of Eric Powell's Chevrolet Silverado between June 10 and November 17, 2010. Although considerable evidence of drug trafficking had been uncovered by June 2010, Agent Donovan testified that a warrant was not obtained because he believed—based on direction from superiors at the DEA and advice from the United States Attorney's Office—that one was not required by the Fourth Amendment. Two years later, the Supreme Court in *Jones* held that placement of a GPS tracking device on a defendant's vehicle was a physical intrusion that constituted a search for purposes of the Fourth Amendment. *United States v. Jones*, 132 S. Ct. 945, 948-51 (2012).[7]

Here, without deciding whether such GPS tracking could ever be reasonable in the absence of a warrant (a question also not decided in *Jones*), the district court assumed that the DEA's tracking of the GPS device placed on the Silverado violated the Fourth Amendment. The district court nonetheless denied the motions to suppress based on a detailed review of the facts surrounding each traffic stop and search. *See Powell*, 943 F. Supp. 2d at 785-91 (applying independent-source, inevitable-discovery, and/or attenuation doctrines). Because it was not necessary to its decision, the district court declined to reach the question of whether the good-faith exception would also apply. *Id.* at 787 n.11. With the benefit of this court's intervening decision in *Fisher*, we do the opposite and affirm on the basis of the good-faith exception. *See United States v. Fisher*, 745 F.3d 200, 201 (6th Cir.), *cert. denied*, 135 S. Ct. 676 (2014).

---

[6]The DOJ has since issued a policy regarding the use of cell-site simulators in criminal investigations that, among other things, adheres to the view that the pen-register statute applies but adopts a general practice of obtaining a warrant for the use of a cell-site simulator. *See DOJ Policy Guidance: Use of Cell-Site Simulator Technology*, U.S. Dep't Just. (Sept. 3, 2015), https://www.justice.gov/opa/file/767321/download.

[7]The *Jones* majority did not decide whether tracking the vehicle over a 28-day period might also have violated an objectively reasonable expectation of privacy, although Justice Alito's concurrence suggested that it might. *Jones*, 132 S. Ct. at 964 (Alito, J., concurring in the judgment); *see also id.* at 957 (Sotomayor, J., concurring) (noting "it may be necessary to reconsider the premise that an individual has no reasonable expectation of privacy in information voluntarily disclosed to third parties").

The exclusion of evidence obtained in violation of the Fourth Amendment is "intended 'to deter future Fourth Amendment violations.'" *Id.* at 203 (quoting *Davis v. United States*, 564 U.S. 229, 236-37 (2011)). "[B]ecause the extent to which the exclusionary rule is justified by these deterrence principles varies with the culpability of the law enforcement conduct, the cost-benefit analysis should focus on the 'flagrancy of the police misconduct' and on whether the police misconduct was 'deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence.'" *Id.* (quoting *Herring*, 555 U.S. at 143-44). "When police act in good faith, however, 'conduct[ing] a search in objectively reasonable reliance on binding appellate precedent, the exclusionary rule does not apply.'" *Id.* (alteration in original) (quoting *Davis*, 564 U.S. at 249-50).

In *Fisher*, this court held that the officers had an objectively reasonable good-faith belief that the warrantless GPS tracking they conducted in May and June of 2010 "was lawful and was sanctioned by then binding appellate precedent." *Id.* at 201. Specifically, at the time of the GPS tracking in *Fisher*, "the Supreme Court had strongly indicated, and the Sixth Circuit and three other circuits had held, that the warrantless use of electronic tracking devices was permissible." *Id.* at 203. Also, as the Seventh Circuit has recognized, "circuits that did not have their own GPS precedent prior to *Jones* have uniformly concluded that [the Supreme Court's decision in] *Knotts* is binding appellate precedent for the purpose of *Davis*'s good-faith exception, even when police officers' GPS monitoring lasted for a longer period of time." *United States v. Taylor*, 776 F.3d 513, 518 n.2 (7th Cir. 2015) (per curiam) (citing cases); *see also United States v. Knotts*, 460 U.S. 276 (1983) (holding that monitoring of a signal from a beeper was not a search). Here, the GPS tracking took place during roughly the same period as in *Fisher*, and the DEA agents acted in objectively reasonable reliance on the then binding appellate precedent. Finding that the good-faith exception applies, we affirm the denial of the defendants' motion to suppress evidence derived from the warrantless GPS vehicle tracking in this case.

### E.    Utility-Pole Camera Surveillance

Finally, defendants challenged evidence obtained as a result of the warrantless video surveillance conducted through the installation of video cameras on three public utility poles for periods of up to 90 days each. One camera was installed near the Conley Street location in April

2010, and the other two cameras were installed near the Stricker Avenue location and the warehouse on Sherwood Avenue in August 2010. There is no dispute that all three of those locations were used in connection with the defendants' drug operation and were not places where the defendants resided. The district court denied defendants' motions to suppress the video recordings (and evidence derived from them) because there was neither physical intrusion nor violation of any reasonable expectation of privacy. Guided by this court's recent decision in *Houston*, we affirm the district court's denial of the defendants' motion to suppress this evidence. *United States v. Houston*, 813 F.3d 282 (6th Cir.), *cert. denied*, 137 S. Ct. 567 (2016).

The court in *Houston* held that remote surveillance of a rural farm with a utility-pole camera for a period of ten weeks without a warrant "did not violate Houston's reasonable expectations of privacy because the camera recorded the same view of the farm as that enjoyed by passersby on public roads." *Id.* at 285. This court emphasized that "the Fourth Amendment does not 'preclude an officer's observations from a public vantage point where he has a right to be and which renders the activities clearly visible.'" *Id.* at 288 (quoting *California v. Ciraolo*, 476 U.S. 207, 213 (1986)). Further, the court rejected the claim that the length of the period of monitoring made the surveillance constitutionally unreasonable, explaining that law enforcement may use technology to augment their activities and that it is the possibility—not the practicability—of in-person surveillance from a public vantage point that is critical. *Id.* at 288-90; *but see id.* at 296-97 (Rose, J., concurring) (finding harmless error).

The district court reviewed the evidence—including photographs of the properties and video footage taken by the pole cameras—and found that each of the cameras viewed areas that were clearly visible from a public vantage point. Defendants argue that the camera at the Conley Street location looked into an area between the house and an unattached garage. However, the district court specifically found that this camera was positioned looking over a half-solid, half-lattice array, "to a location where the public could easily see from another vantage point." With respect to the Stricker Avenue location, the district court found the pole camera observed a driveway that was open and accessible to public view. Finally, the district court found that the pole camera outside the Sherwood Avenue warehouse viewed a common yard between buildings that was "open to many directions and surrounded by roads and alleyways" and had no

obstructions that would prevent someone from observing the defendants "comings and goings." *See, e.g., United States v. Wymer*, 654 F. App'x 735, 743-44 (6th Cir. 2016) (holding warrantless surveillance of commercial property from utility-pole cameras that recorded for five months was not a search), *cert. denied*, _ S. Ct. _, 2017 WL 276211, 2017 WL 276212 (Jan. 23, 2017). Defendants have not demonstrated that those findings were clearly erroneous.

We affirm the district court's denial of the defendants' motions to suppress evidence.

### III. Request for Self-Representation

Carlos Powell's claim that he was deprived of his Sixth Amendment right to self-representation asserts structural error for which harm need not be shown in order to reverse. *McKaskle v. Wiggins*, 465 U.S. 168, 177 n.8 (1984). There is uncertainty in this circuit concerning the standard for reviewing such claims. *See United States v. Evans*, 559 F. App'x 475, 478 (6th Cir. 2014). Decisions denying a defendant's request for self-representation have been reviewed *de novo* and for abuse of discretion. *See, e.g., United States v. Jones*, 489 F.3d 243, 247 (6th Cir. 2007); *Robards v. Rees*, 789 F.2d 379, 383-84 (6th Cir. 1986). We need not resolve this uncertainty, however, because we would affirm the district court under either standard of review. *See United States v. Pryor*, 842 F.3d 441, 448 (6th Cir. 2016); *United States v. Clark*, 774 F.3d 1108, 1112 (7th Cir. 2014).[8]

### A.    *Faretta*

The Sixth Amendment guarantees a criminal defendant the right to counsel, as well as the corollary right to waive counsel and proceed *pro se* even when the court believes that it would not be advisable. *Faretta v. California*, 422 U.S. 806, 807, 819-20 (1975). A defendant's waiver of the right to counsel must be made knowingly, intelligently, and voluntarily. *Iowa v. Tovar*, 541 U.S. 77, 87-88 (2004); *see also United States v. Martin*, 25 F.3d 293, 295 (6th Cir. 1994). As a result, before a defendant may be deemed to have validly waived the right to counsel, he must be warned specifically of the "dangers and disadvantages of self-representation." *Faretta*,

---

[8]Under a *de novo* standard, we review the district court's legal conclusions *de novo* and the underlying factual findings for clear error. *United States v. Cromer*, 389 F.3d 662, 679 (6th Cir. 2004); *see also United States v. Bush*, 404 F.3d 263, 270 (4th Cir. 2005); *United States v. Mackovich*, 209 F.3d 1227, 1236 (10th Cir. 2000).

422 U.S. at 835; *see also Hill v. Curtin*, 792 F.3d 670, 677-78 (6th Cir.) (en banc), *cert. denied*, 136 S. Ct. 593 (2015). This court has instructed district judges to "ask the defendant a series of questions drawn from, or substantially similar to, the model inquiry set forth in the *Bench Book for United States District Judges*." *United States v. McBride*, 362 F.3d 360, 366 (6th Cir. 2004). The model inquiry is to be followed by "a strong admonishment that the court recommends against the defendant trying to represent himself or herself." *United States v. Williams*, 641 F.3d 758, 767 (6th Cir. 2011).

But, a defendant's right to self-representation "is not absolute." *Martinez v. Court of Appeal of Cal.*, 528 U.S. 152, 161 (2000); *see also Indiana v. Edwards*, 554 U.S. 164, 171 (2008) (citing cases). "[T]he government's interest in ensuring the integrity and efficiency of the trial at times outweighs the defendant's interest in acting as his own lawyer." *Martinez*, 528 U.S. at 162. A defendant must assert the right to self-representation clearly, unequivocally, and in a timely manner, and "courts will balance any such assertion against considerations of judicial delay." *Martin*, 25 F.3d at 295-96. Even a clear request made prior to trial may be denied when it "is merely a tactic to secure a delay in the proceeding." *Robards*, 789 F.2d at 383 (noting that the defendant in *Faretta* "had a genuine inclination to conduct his own defense"). In assessing the facts and circumstances of a particular case, the trial judge is "in a unique position to balance the defendant's Sixth Amendment right against delay, defense gamesmanship, and other practical concerns." *United States v. Cunningham*, 564 F. App'x 190, 194 (6th Cir. 2014). That includes "distinguish[ing] between a manipulative effort to present particular arguments and a sincere desire to dispense with the benefits of counsel." *Halder v. Tibals*, 561 F. App'x 454, 464 (6th Cir. 2014) (quoting *United States v. Frazier-El*, 204 F.3d 553, 560 (4th Cir. 2000)); *see also United States v. Bush*, 404 F.3d 263, 271-72 (4th Cir. 2005).

## B.    Analysis

Carlos Powell retained counsel at the time of his indictment and did not indicate a desire to represent himself until the day of the final pretrial conference. At defense counsel's suggestion, and without objection from Powell, the district court agreed to conduct the required inquiry after counsel had a chance to talk with his client. During the continued conference, the district court reiterated that no continuance would be granted and confirmed that Powell was

asserting his right to represent himself. There is no dispute that the colloquy that followed complied with *Faretta* and was consistent with the model inquiry required by this court.

In ruling on the record, however, the district court denied Powell's request in reliance on inapposite case law and a balancing of factors that were inapplicable to an asserted right to self-representation. The government moved for reconsideration "out of an abundance of caution concerning the risk of this becoming an issue on appeal," asking that Powell be allowed to represent himself with the aid of standby counsel. Powell makes much of that motion on appeal, but we view it as reflecting the government's legitimate attempt to hedge against the very claim of structural error being made here. In fact, the motion resulted in an order that clarified the basis for the district court's decision. Specifically, the district court assumed that the request was timely, but found that the "colloquy and surrounding circumstances convinced [it] that Powell's request was not made in good faith but was intended as a tactic to delay the trial." It is that order we must review.

Powell contends that his waiver of the right to counsel was improperly rejected because the arguments he wanted to make were deemed "meritless." It is true that a defendant's lack of legal skill or knowledge will not prevent him from competently or intelligently waiving his right to counsel. *Faretta*, 422 U.S. at 835; *see also Godinez v. Moran*, 509 U.S. 389, 400 (1993) ("[A] criminal defendant's ability to represent himself has no bearing on his competence to *choose* self-representation."). Nor is a defendant prevented from competently waiving his right to counsel because he "articulate[s] beliefs that have no legal support." *United States v. James*, 328 F.3d 953, 955 (7th Cir. 2003) (upholding waiver of counsel by a defendant whose defense was based on meritless Moorish Science Temple legal beliefs). In *James*, however, the issue arose because the defendant rejected appointed counsel, represented himself at trial, and then claimed on appeal that he should not have been allowed to proceed *pro se* because his beliefs were meritless. Here, in contrast, the challenged statements by the district court were central to the warning required by *Faretta* in an attempt to impress upon Powell the perils of dispensing with counsel in order to re-file documents that would not be considered.

Specifically, the district court inquired into the circumstances of Powell's request and determined that it did not arise out of conflict or dissatisfaction with his retained counsel of more

than two years. Rather, Powell explained: "It's particular documents I need to file, and also you stated that the attorney didn't file the documents so you're striking them." Everyone understood Powell to be referring to the stricken documents from the Moorish Science Temple of America. The district court explained to Powell that the stricken documents would not be considered because they were "meritless" and "irrelevant" to the substance of his case.[9]

That is, since Powell's request was expressly premised on his desire to file those documents, the district court asked:

> Now, if I hear you correctly, you're saying in order to file documents that may have a very negative impact on your case and get that opportunity, you want to fire your lawyer. And then the additional consequence[] is to have this trial . . . without him at your side because it's so important for you to file these documents. Is that what you're saying?

Powell replied that he had "Constitutional issues," and asked, "So how else will I get them filed?" The district court told Powell that his counsel's unwillingness to file those documents should tell him that he "may not have a real good Constitutional argument there." Asked again whether he wanted to fire his attorney in order to file documents that had "no legal significance," Powell stated that his "life was on the line" and he wanted to present himself the best way he could. Then, despite having reviewed the model inquiry with counsel, Powell claimed not to understand what a "criminal" action was; stated that he had heard he was charged with a crime but that he had not "presented himself"; and asked if he could defend himself with the "Constitution and treaties." Powell also asked about standby counsel before agreeing that he would be on his own. Finally, Powell acknowledged that the rules of evidence and procedure would apply to him, saying he would get no "special privileges."

The district court proceeded to candidly express its skepticism about Powell's intentions, noting that Powell is a "very sharp fellow," perhaps sharper than he was letting on, and insinuating that Powell was "engaged in a ploy to avoid trial at the last minute." The district

---

[9]Powell's appeal described those documents as embodying the Moorish Science belief that, because he claimed Moorish ancestry, the court's authority was circumscribed by treaty obligations with the Moorish Empire. *See James*, 328 F.3d at 954. Powell does not challenge the district court's assessment of these claims as irrelevant and frivolous. *See United States v. Cannon*, 560 F. App'x 599, 601 (7th Cir. 2014) (rejecting jurisdictional arguments based on Moorish Science Temple beliefs as frivolous). Self-representation is not a license to disregard "relevant rules of procedural and substantive law." *Faretta*, 422 U.S. at 834 n.46.

court added that, having seen some of the government's evidence, it might behoove Powell to "be more familiar with some of these meritless arguments." The district court admonished Powell again about the perils of dispensing with counsel—particularly as he seemed to be armed with meritless theories—before Powell declared that his decision was voluntary. In the order denying reconsideration, the district court made explicit its finding that Powell's assertion of the right to self-representation "was not made in good faith but was intended as a tactic to delay trial." Powell contends that there was no factual basis for this inference. We disagree.

The timing and circumstances of Powell's request support the district court's finding. Although circumstances will vary from case to case, the district court could consider Powell's relationship with his counsel, the timing of his request, and the fact that his request was based at least in part on the refusal of counsel to file frivolous documents. *See, e.g., United States v. Mackovich*, 209 F.3d 1227, 1237 (10th Cir. 2000); *see also United States v. Edelmann*, 458 F.3d 791, 809 (8th Cir. 2006). Powell elected to retain counsel at the time of his indictment and did not express dissatisfaction with counsel's representation or indicate any desire to represent himself for more than two years. It was not until the day of the final pretrial conference that Powell first indicated that he wanted to represent himself—two years after indictment, six months after resolution of the last of the suppression motions, and only after a firm trial date was imminent.[10]

Powell's request was premised on his counsel's unwillingness to file the stricken documents—not resistance to being represented by counsel. Even some of Powell's answers to the model inquiry echoed theories reflected in the stricken documents. The district court's skepticism of Powell's motives is also supported by the fact that he previously filed similar Moorish Science Temple documents in two related proceedings. Yet, Powell did not file, attempt to file, or seek to dismiss counsel for not filing, documents based on his Moorish Science Temple beliefs until one month before trial in the two-year-old case. The circumstances surrounding Powell's proffered waiver of the right to counsel permitted the district court to infer

---

[10]Powell claims to have acknowledged that no continuance would be granted. But, the record shows that Powell neither asked for a continuance nor stated that one would not be necessary if he were allowed to represent himself. Nothing about Powell's implicit acquiescence in district court's statements about the firmness of the trial date would have precluded him from asking for more time to prepare on the eve of trial.

that it was a manipulative effort to present frivolous arguments rather than "a sincere desire to dispense with the benefits of counsel." *Frazier-El*, 204 F.3d at 560; *see also Bush*, 404 F.3d at 271-72; *Mackovich*, 209 F.3d at 1237-38. The district court did not err in finding that Powell's assertion of his right to self-representation was not made in good faith but was intended as a tactic to delay the trial. We affirm the denial of Powell's request to represent himself.[11]

## IV. Withdrawal of Counsel

Earnest Proge argues that he was deprived of his right to counsel of choice when the district court refused to allow his retained counsel to withdraw. The Sixth Amendment guarantees "the right of a defendant who does not require appointed counsel to choose who will represent him." *United States v. Gonzalez-Lopez*, 548 U.S. 140, 144 (2006). Deprivation of that right is structural error that does not require a showing of prejudice or that the counsel defendant received was ineffective. *Id.* at 148. But, that right "is circumscribed in several important respects." *Id.* at 144 (quoting *Wheat v. United States*, 486 U.S. 153, 159 (1988)). Among those limitations is the trial court's discretion "in balancing the right to counsel of choice against the needs of fairness" and "the demands of its calendar." *Id.* at 152; *see also Wilson v. Mintzes*, 761 F.2d 275, 280 (6th Cir. 1985). A district court's decision to deny a motion to withdraw or for substitute counsel is reviewed for abuse of discretion. *See United States v. Chambers*, 441 F.3d 438, 446 (6th Cir. 2006).

Once a defendant brings "any serious dissatisfaction with counsel to the attention of the district court," the court has an obligation to inquire into the source and nature of the dissatisfaction and may grant a motion to withdraw or for substitute counsel if there is a showing of good cause. *Benitez v. United States*, 521 F.3d 625, 632 (6th Cir. 2008) (quoting *United States v. Iles*, 906 F.2d 1122, 1131-32 (6th Cir. 1990)). Appellate courts reviewing the denial of such a motion generally consider four factors: "the timeliness of the motion"; "the adequacy of the court's inquiry into the matter"; "the extent of the conflict between the attorney and client and whether it was so great that it resulted in a total lack of communication preventing an adequate defense"; and "the balancing of these factors with the public's interest in the prompt

---

[11]The district court did not know Powell would flee during the jury's deliberations, but the fact that he did is consistent with the finding of dilatory intent.

and efficient administration of justice." *United States v. Mack*, 258 F.3d 548, 556 (6th Cir. 2001); *see also Benitez*, 521 F.3d at 632 (reviewing a motion to substitute retained counsel). Balancing these factors, we hold that the district court abused its discretion by allowing one but not both of Proge's attorneys to withdraw under the circumstances.

It was during the final pretrial conference one month before trial that Proge's counsel stated that Proge wanted new counsel and was "prepared to either petition the government for that counsel and/or obtain private counsel." In making a record of Proge's decision to reject the plea offer against the advice of counsel, Proge said he felt like it was "an apple being forced down [his] throat" and that there was not "enough time to make a proper decision." The district court extended the time for Proge to enter into a plea agreement, but put off his request for new counsel and invited his attorneys to file a motion to withdraw. That motion was filed three weeks before trial, a hearing was held two weeks before trial, the motion was denied *in toto* one week before trial, and motions for reconsideration were granted in part, and denied in part, one day before trial.

This court has considered a request for new counsel made just days or weeks before trial to be untimely. *See United States v. Trujillo*, 376 F.3d 593, 606-07 (6th Cir. 2004) (finding request made three days before trial was untimely); *United States v. Williams*, 176 F.3d 301, 314 (6th Cir. 1999) (finding motion for substitute counsel made two weeks before trial was untimely). Although Proge's request was not made on the eve of trial, the government relies on this court's finding in *Chambers* that a motion for substitution of counsel made one and a half months before trial was untimely. *Chambers*, 441 F.3d at 447. But, in *Chambers* the request was untimely because the defendant's complaint was that his counsel would not allow him access to certain discovery materials when discovery had been complete for nearly a year. *Id.*; *see also United States v. Marrero*, 651 F.3d 453, 464-65 (6th Cir. 2011) (finding defendant belatedly conveyed his dissatisfaction with counsel). Here, the breakdown that motivated Proge's request for new counsel occurred the day before the final pretrial conference. *Cf. United States v. Israel*, __ F. App'x __, 2016 WL 6407245, at *3 (6th Cir. Oct. 31, 2016) ("We are not persuaded defendant acted diligently in bringing his concerns to the district court's attention.").

Once the defendant made his dissatisfaction known, the district court was obligated to inquire into the source and nature of the conflict. *Benitez*, 521 F.3d at 634. To satisfy this requirement, "the district court simply must allow a defendant the opportunity to explain the attorney-client conflict as he perceives it." *Marrero*, 651 F.3d at 465. This "not only aids in determining whether 'good cause' has been shown, but serves to ease the defendant's distrust, to preserve the integrity of the trial process, and to foster confidence in the jury verdict." *Iles*, 906 F.2d at 1131. The district court did not conduct any inquiry when new counsel was requested, but Proge, his attorneys, and the prosecutor had an opportunity to address the issue during a hearing 21 days later and in the supplemental briefing and motions for reconsideration that followed. While an earlier inquiry might have served its purposes better, the district court's inquiry into the source of Proge's conflict with counsel was adequate.

The motion to withdraw outlined the efforts made to negotiate the plea offer and made clear that there had been a complete breakdown in communication with Proge after lengthy discussions with him regarding the plea offer. The district court described Proge's chief complaint to be his attorneys' opposition to him proceeding to trial, but explained that Proge was free to reject his attorneys' advice to accept the plea offer. "[A] defendant's differences of opinions with his attorney do not create a complete breakdown of communication that compromises his defense." *Marrero*, 651 F.3d at 466; *see also United States v. Griffin*, 476 F. App'x 592, 596 (6th Cir. 2011) (finding no conflict when dissatisfaction was over counsel's encouragement of a guilty plea). Also, "a lack of communication resulting from a defendant's refusal to cooperate with his attorney does not constitute good cause for substituting counsel." *Marrero*, 651 F.3d at 466; *see also United States v. Vasquez*, 560 F.3d 461, 468 (6th Cir. 2009).

In this case, however, the record belies the conclusion that there was either no conflict or that Proge was entirely to blame. There was not just a disagreement over whether it was in Proge's best interest to accept the plea offer. It was during the lengthy discussions about the plea offer that Proge's attorneys told him that they had not been retained to represent him at trial, had not prepared for trial, were not equipped to represent him at trial, and would seek to withdraw if he did not accept the plea offer. Proge claimed to be surprised by this, insisted that he did not want attorneys who did not want to fight for him, and repeated that he wanted to hire a new

lawyer to represent him at trial.   Defense counsel agreed that there was an irreconcilable breakdown in the attorney-client relationship and that, as would become apparent, Proge did not have the resources to pay for further representation.   The conflict between Proge and his attorneys resulted in a complete lack of communication that weighs strongly in his favor.

Finally, the court must balance the defendant's "right to counsel of his choice and the public's interest in the prompt and efficient administration of justice." *Wilson*, 761 F.2d at 280. When a request for substitute counsel would "almost certainly necessitate a last-minute continuance, the trial judge's actions are entitled to extraordinary deference." *Vasquez*, 560 F.3d at 467 (quoting *United States v. Whitfield*, 259 F. App'x 830, 834 (6th Cir. 2008) (per curiam)). But, a trial court may not arbitrarily and unreasonably interfere with a defendant's right to counsel of choice in the name of calendar control. *Wilson*, 761 F.2d at 281.   The district court put off making inquiry into the conflict despite a specific request for new counsel and indication of a serious conflict, which contributed to the likelihood that a last-minute continuance would be necessary.   Nor is this a case in which new counsel was sought based on frivolous complaints about attorney performance. *See United States v. Saldivar-Trujillo*, 380 F.3d 274, 278 (6th Cir. 2004).   Considering that the request for new counsel was made timely and more than a month before trial, that the inquiry was delayed though adequate, and that there was a complete breakdown in the attorney-client relationship, the insistence that trial go forward without allowing for substitute counsel violated Proge's Sixth Amendment rights.   The district court abused its discretion in denying the motion of retained counsel to withdraw in this case.[12]

## V. Sufficiency of the Evidence

Although reversal of Proge's convictions is required by the violation of his Sixth Amendment rights, we still must decide his sufficiency-of-the-evidence claims because reversal on that ground would preclude retrial. *See United States v. Nelson*, 725 F.3d 615, 619 (6th Cir. 2013).   The question for this court is whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of

---

[12]"[A] defendant relying on court-appointed counsel has no constitutional right to the counsel of his choice." *Daniels v. Lafler*, 501 F.3d 735, 740 (6th Cir. 2007); *see also Gonzalez-Lopez*, 548 U.S. at 151.   Here, despite hints that appointed counsel might be necessary, Proge's trial counsel was not appointed to represent him until after the motion to withdraw was denied and trial had begun.

the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). Proge does not challenge the sufficiency of the evidence to support his firearm conviction (Count 8) and cannot be retried on the substantive drug charge for which he was acquitted (Count 3). For the reasons that follow, we hold that the evidence was sufficient to support Proge's convictions for: conspiracy to possess with intent to distribute and to distribute marijuana, five kilograms or more of cocaine, and one kilogram or more of heroin (Count 1); possession with intent to distribute one kilogram or more of heroin (aiding and abetting) (Count 2); and conspiracy to commit money laundering (Count 10).

First, in order to establish a drug conspiracy in violation of 21 U.S.C. § 846, "the government must prove, beyond a reasonable doubt, '(1) an agreement to violate drug laws, (2) knowledge and intent to join the conspiracy, and (3) participation in the conspiracy.'" *United States v. Gibbs*, 182 F.3d 408, 420 (6th Cir. 1999) (quoting *United States v. Welch*, 97 F.3d 142, 148 (6th Cir. 1996)). Once the existence of the conspiracy is proven, only slight evidence is needed to connect a defendant to the conspiracy. *Id.* at 422. Proge's knowledge and intent to join the conspiracy may be inferred from his conduct and established by circumstantial evidence. *United States v. Martinez*, 430 F.3d 317, 330 (6th Cir. 2005). Proge does not dispute that there was overwhelming evidence that the conspiracy to distribute drugs existed. Instead, he argues that the evidence failed to prove more than his mere association with the Powells. This claim is without merit.

Proge was not just seen associating with the Powells. It is true that Proge was not in the Volkswagen with Whigham when the ten kilograms of heroin was seized on June 23. But, Proge was observed waiting with Whigham and Eric Powell for the heroin to be loaded into the Volkswagen, was followed as he and Eric Powell traveled in tandem with the Volkswagen, and was seen leaving the highway to double back when Whigham was stopped. Proge was subsequently stopped on September 17 transporting $2.2 million in cash in locked suitcases loaded by the Powells, after meeting Eric Powell at the warehouse, and while being followed by Eric Powell and a coconspirator in the Silverado. Proge stopped initially, but fled at high speed (with the Silverado taking up the chase) before finally being stopped. There was evidence that Proge told officers that there was a lot of cash in the car but that he was just the driver. When

Eric Powell transported suitcases from the Stricker Avenue location to a hotel in Ann Arbor on October 1, Proge was seen helping to load a heavy suitcase into a Toyota that was sitting in the parking lot. There was also evidence that Proge was present on October 22, when suitcases containing cash and 12 kilograms of cocaine were transferred to Margarita Lopez de Vallejo's Toyota in the same hotel parking lot. When viewed in the light most favorable to the prosecution, the evidence was sufficient to lead a rational trier of fact to conclude that Proge knowingly and intentionally joined the drug-distribution conspiracy.

Count 2 charged Proge, Whigham, and Eric Powell with possession with intent to distribute one kilogram or more of heroin on June 23, 2010. Proge argues that there was insufficient evidence to establish that he had actually or constructively possessed the heroin that was seized from the Volkswagen. *See United States v. Newsom*, 452 F.3d 593, 609 (6th Cir. 2006). However, Proge does not dispute that the evidence was sufficient to lead a rational juror to conclude he was guilty under either a *Pinkerton* coconspirator liability theory or an aiding-and-abetting theory. *See United States v. Martin*, 920 F.2d 345, 348 (6th Cir. 1990) (*Pinkerton* theory).

Lastly, to establish a money-laundering conspiracy "the government must prove (1) that two or more persons conspired to commit the crime of money laundering, and (2) that the defendant knowingly and voluntarily joined the conspiracy." *United States v. Prince*, 618 F.3d 551, 553-54 (6th Cir. 2010); *see also Whitfield v. United States*, 543 U.S. 209, 212 (2005) (holding that an 18 U.S.C. § 1956(h) conspiracy does not require proof of an overt act). There was ample proof that a money-laundering conspiracy existed, and the evidence was sufficient to lead a rational juror to conclude that Proge conducted or attempted to conduct a financial transaction knowing that it involved the proceeds of drug trafficking and with intent to promote the drug trafficking. *United States v. Skinner*, 690 F.3d 772, 782 (6th Cir. 2012) (finding evidence sufficient where defendant "knowingly and routinely transported drug proceeds in furtherance of the drug-trafficking conspiracy"); *see United States v. Kelso*, 468 F. App'x 551, 555 (6th Cir. 2012) (noting that the "paradigmatic example" of promotional money laundering is a drug dealer using the proceeds of a drug transaction to purchase additional drugs).

The government concedes that the judgment incorrectly stated that Proge was found guilty on Counts 1, 2, 3, 8, and 10, when the jury found him not guilty on Count 3. On remand, Proge is entitled to entry of judgment of acquittal with respect to Count 3. But, because Proge has not prevailed on his sufficiency-of-the-evidence claims, retrial is not precluded on remand with respect to Counts 1, 2, 8, and 10.

## VI. *Apprendi* and *Alleyne*

Carlos Powell filed a separate *pro se* supplemental brief raising additional claims of sentencing error. We need not address his additional claims since he is represented by counsel who has filed a brief on appeal. *See United States v. Williams*, 641 F.3d 758, 770 (6th Cir. 2011). But, we exercise our discretion to do so in order make clear that his sentences do not violate *Apprendi v. New Jersey*, 530 U.S. 466 (2000), or *Alleyne v. United States*, 133 S. Ct. 2151 (2013).

Powell's claim that his sentence on the multiple-object drug conspiracy could not exceed the five-year maximum for conspiracy involving an unspecified quantity of marijuana is based on a misapprehension of our decision in *United States v. Dale*, 178 F.3d 429 (6th Cir. 1999). In *Dale*, we held that "when an indictment charges a defendant with a multiple-object conspiracy and the jury is instructed to agree unanimously as to whether one drug or both drugs referred to in the indictment are the objects of the conspiracy, the defendant must be sentenced as if the conspiracy involved only the drug with the lower penalty *when the jury returns a verdict not specifying the substance found.*" *United States v. Tosh*, 330 F.3d 836, 840 (6th Cir. 2003) (emphasis added). *Dale* does not apply, here, because the jury returned a verdict specifically finding that the drug conspiracy involved at least five kilograms of cocaine and at least one kilogram of heroin (Count 1).

*Apprendi* held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. at 490. *Apprendi* proscribed judicial fact-finding that increased the statutory maximum, and *Alleyne* extended that principle to apply "with equal force to facts increasing the mandatory minimum." 133 S. Ct. at 2160. Here, the drug quantities

that increased the statutory penalties for Powell's drug-conspiracy conviction to a term of imprisonment of not less than ten years or more than life were charged in the indictment, submitted to the jury, and found beyond a reasonable doubt. *See* 21 U.S.C. §§ 846 and 841(b)(1)(A). The same is true for Powell's convictions on the substantive drug offenses, which the jury specifically found had involved at least five kilograms of cocaine and at least one kilogram of heroin, respectively (Counts 3 and 4). To the extent that Powell also complains that the district court engaged in impermissible fact-finding in determining his sentences, judicial fact-finding that results in a Guidelines range above the minimum but not exceeding the maximum sentence would not violate *Apprendi* or *Alleyne*. *See United States v. Cooper*, 739 F.3d 873, 884 (6th Cir. 2014); *United States v. Johnson*, 732 F.3d 577, 584 (6th Cir. 2013).

## VII.

We **AFFIRM** the denial of defendants' motions to suppress; **AFFIRM** the judgments entered against Carlos Powell and Eric Powell, respectively; and **VACATE** the convictions of Earnest Proge and **REMAND** for entry of judgment of acquittal on Count 3 and for further proceedings with respect to Counts 1, 2, 8, and 10.

---

## CONCURRING IN PART AND DISSENTING IN PART

---

KAREN NELSON MOORE, Circuit Judge, concurring in part and dissenting in part. What more could Earnest Proge or Carlos Powell have done? At their Final Pretrial Conference on March 26, 2014, both men raised serious concerns with their legal representation. Proge moved to substitute his retained counsel. Powell moved to represent himself. With their trial for orchestrating one of the largest drug-trafficking conspiracies in the history of Detroit weeks away, both men sought to avail themselves of fundamental protections that the Sixth Amendment enshrines: for Proge, the right to counsel of choice; for Powell, the right to self-representation.

The facts of what followed are sobering. The *government* urged the district court to grant Powell's *Faretta* motion and Proge's motion to substitute counsel. The district court declined. It forced Proge to proceed with an attorney who, by her own repeated admissions, had not prepared for trial. It refused to allow Powell to represent himself, even though Powell knowingly and voluntarily waived his right to counsel.

Those were structural errors. The district court erred when it refused to allow Proge to substitute his retained counsel. And it erred when it denied Powell's *Faretta* motion. I agree with the majority in vacating Proge's conviction and provide more detail supporting that decision. Because I believe that Carlos Powell should have been permitted to represent himself, I respectfully dissent from Part III of the majority.

## I. RIGHT TO COUNSEL OF CHOICE

"The right to select counsel of one's choice . . . has been regarded as the root meaning of the constitutional guarantee" that the Sixth Amendment embodies. *United States v. Gonzalez-Lopez*, 548 U.S. 140, 147–48 (2006). "Given the necessarily close working relationship between lawyer and client, the need for confidence, and the critical importance of trust . . . the [Supreme] Court has held that the Sixth Amendment grants a defendant 'a fair opportunity to secure counsel of his own choice.'" *Luis v. United States*, 136 S. Ct. 1083, 1089 (2016) (quoting *Powell v. Alabama*, 287 U.S. 45, 53 (1932)). The district court denied Proge this opportunity when it

forced him to proceed to trial with an attorney who was unprepared to defend her client. Because that was a structural error, *Gonzalez-Lopez*, 548 U.S. at 152, I agree with the majority that we must vacate Proge's conviction.

We weigh four factors when reviewing a district court's denial of a defendant's motion to substitute counsel: (1) "the timeliness of the motion"; (2) "the adequacy of the court's inquiry into the defendant's complaint"; (3) "whether the conflict between the attorney and client was so great that it resulted in a total lack of communication preventing an adequate defense"; and (4) the balance between "the accused's right to counsel of his choice and the public's interest in the prompt and efficient administration of justice." *United States v. Mooneyham*, 473 F.3d 280, 291 (6th Cir. 2007) (quoting *United States v. Salvidar-Trujillo*, 380 F.3d 274, 277 (6th Cir. 2004)). Here, all four factors militate in favor of granting Proge's motion, and the district court abused its discretion when it ruled otherwise.

1. Timeliness: Proge's request to substitute counsel was timely because—as the government wrote in its brief recommending that the district court grant that request—Proge raised this issue *one day* after his relationship with his attorneys deteriorated completely. R. 268 (4/17/14 Gov't Supp. Br. at 3–4) (Page ID #2055–56).

In their motion to withdraw, Proge's attorneys—Patricia Maceroni and Linda Bernard—explained that on March 25, 2014, they met with Proge to review a Rule 11 plea agreement. R. 258 (4/3/14 Mot. to Withdraw at 4) (Page ID #1995). The *next day*, at the March 26 Pretrial Conference, Bernard explained to the district court that Proge wanted to reject the plea agreement and proceed to trial. R. 490 (Final Pretrial Conference Tr. at 29) (Page ID #4205). Neither Bernard nor Maceroni, however, was prepared to assist Proge in that effort: their representation had been limited to negotiating a plea agreement and filing pretrial motions. R. 587 (4/16/14 Hr'g Tr. at 41) (Page ID #9143). Accordingly, Proge's attorneys "did not obviously prepare for trial." *Id.* at 44 (Page ID #9146). Proge's rejection of the plea agreement thus triggered "a complete breakdown in the attorney-client relationship such that [his attorneys could] no longer be effective advocates for Mr. Proge." R. 258 (4/13/14 Mot. to Withdraw at 4) (Page ID #1995). One day after that complete breakdown, Proge, understandably concerned that

his attorneys "didn't want to represent [him] in trial," R. 587 (4/15/14 Hr'g Tr. at 51) (Page ID #9153), informed the district court that he wished to seek new counsel.

The district court reasoned that Proge's request was not timely because "[t]he first indication that he was dissatisfied with his attorneys arose right before the final pretrial conference, and [his attorneys' motion to withdraw] was ultimately not filed until less than three weeks before the trial." R. 282 (4/22/14 Order at 4) (Page ID #2147). I fail to see how Proge could have moved to substitute counsel *sooner*. He implored the district court to allow him to hire a new attorney within one day of learning that his attorneys were not ready to continue representing him. That was a timely request.

2. Adequacy of court's inquiry: "Once a defendant" informs the district court that he wishes to substitute retained counsel, "the district court is obligated to inquire into the defendant's complaint and determine whether there is good cause for the substitution." *Benitez v. United States*, 521 F.3d 625, 632 (6th Cir. 2008). "[W]here a district court is on notice of a criminal defendant's dissatisfaction with counsel, the court has an affirmative duty to inquire as to the source and nature of that dissatisfaction—regardless of whether the attorney is court-appointed or privately retained." *Id.* at 634. The district court failed to fulfill that duty here.

At the Final Pretrial Conference, Bernard informed the district court that she and Maceroni would be filing a motion to withdraw from representing Proge. R. 490 (Final Pretrial Conference Tr. at 27) (Page ID #4203). The district court responded: "I'll tell you right now, you may not have those motions granted I hate to tell you, okay?" *Id.* The district court's unwillingness to allow Maceroni and Bernard to withdraw became clearer during its subsequent colloquy with Proge. After hearing from Bernard, the district court asked Proge a few questions about why he wanted to reject his plea agreement, but did *not* ask any substantive questions about Proge's dissatisfaction with his attorneys. *Id.* at 32–34 (Page ID #4208–10).

It was not until three weeks later—at a hearing on April 16—that the district court actually asked Proge why he had moved to substitute counsel. First, however, the district court telegraphed its thoughts on the matter: "I think this is a ploy. I think he's trying to delay the trial. I think he's trying to interfere with the administration of justice." R. 587 (4/16/14 Hr'g Tr.

at 49) (Page ID #9151). By the time Proge revealed his complete dissatisfaction with his attorneys—"I don't want attorneys that don't want me. . . . I don't feel that I would get proper representation from them."—it was clear that the district court had already made up its mind. *Id.* at 52 (Page ID #9154). Put simply, the district court predicated its inquiry on the background assumption that Proge was trying to disrupt his trial. That inquiry was thus inadequate.

3. <u>Conflict between attorney and client</u>: This factor alone should have impelled the district court to grant Proge's request to substitute counsel.

Consider how Bernard and Maceroni characterized their relationship with Proge in their motion to withdraw: "Both Ms. Bernard and Ms. Maceroni affirmatively state that there has been a complete breakdown in the attorney-client relationship such that they can no longer be effective advocates for Mr. Proge." R. 258 (4/3/14 Mot. to Withdraw at 4) (Page ID #1995). They repeated this claim in a supplement to that motion: "[T]here has been an irreconcilable breakdown in the attorney-client relationship. Both attorneys believe, as officers of the Court, that they cannot be effective counsel for Mr. Proge." R. 267 (Supp. to Defense Counsels' Mot. to Withdraw at 1–2) (Page ID #2050–51).

The district court nonetheless rejected Bernard's and Maceroni's motion to withdraw. R. 282 (4/22/14 Order at 9) (Page ID #2152). Curiously, the district court characterized that motion as "*Earnest Proge's* motion for withdrawal of attorneys." *Id.* (emphasis added). Not so: it was Proge's *attorneys* who were pleading with the district court to release them from representing Proge.

Proge's attorneys were not finished. Maceroni filed a motion for reconsideration, arguing that her continued representation of Proge would force her to violate *multiple* Michigan Rules of Professional Conduct. R. 284 (Maceroni Mot. for Recons. at 1–2) (Page ID #2159–60). Maceroni added: "[I]n forcing Counsel to continue representing Mr. Proge through trial, Counsel cannot meet her responsibilities under the Michigan Rules of Professional Conduct. The ramifications to Counsel's professional standing will be damaging and long lasting." *Id.* at 3 (Page ID #2161).

Bernard echoed Maceroni's concerns in a separate motion for reconsideration, writing that she "would not like [her] professional standing in the legal community to be compromised as a result of the ineffective and inefficient handling of this matter." R. 288 (Bernard Mot. for Recons. at 3) (Page ID #2207). Bernard had even more serious concerns. She informed the district court that she had "never handled a criminal jury trial or bench trial in federal court." *Id.* at 2 (Page ID #2206). And she revealed that she had "limited knowledge of the [Federal Rules of Evidence] and the [Federal Rules of Criminal Procedure]." *Id.*

Presented with a broken attorney-client relationship, the district court allowed Bernard to withdraw—but ordered Maceroni to continue representing Proge. R. 302 (4/28/14 Order at 7) (Page ID #2406). Proge was thus forced to enter the trial of his life with an attorney who believed adamantly that her professional relationship with him was damaged beyond repair.

4. Interests of Justice: This final prong requires us to "consider *both* [Proge's] rights and the rights of the public." *Cobb v. Warden, Chillicothe Corr. Inst.*, 466 F. App'x 456, 463 (6th Cir. 2012). Plainly, the district court's denial of Maceroni's motion to withdraw prejudiced—grievously—Proge's right to be represented by an attorney of his choosing. In an effort to counterbalance this constitutional violation, the district court reasoned that allowing Maceroni to withdraw would have "seriously prejudice[d] the administration of justice and the government's limited public resources." R. 302 (4/28/14 Order at 7) (Page ID #2406).

The government saw things differently. In its April 17 supplemental brief, the government wrote that although allowing Proge to substitute his counsel would impair the government's interest "in moving [Proge's] case to completion," the district court should nonetheless allow Proge's attorneys to withdraw "and require [Proge] to immediately find new counsel." R. 268 (4/17/14 Gov't Supp. Br. at 6–7) (Page ID#2058–59). The government repeated this recommendation in its April 28 response submission, where it wrote that "the government continues to believe that the most cautious approach would be to allow counsel to withdraw from the case." R. 298 (4/18/14 Gov't Resp. at 1) (Page ID #2370). The government's repeated request that the district court *grant* Proge's motion to substitute counsel undercuts the district court's conclusion that the public interest would have been best served by denying that motion.

\* \* \*

"[E]rroneous deprivation of the right to counsel of choice [carries] 'consequences that are necessarily unquantifiable and indeterminate . . . .'" *Gonzalez-Lopez*, 548 U.S. at 150 (quoting *Sullivan v. Louisiana*, 508 U.S. 275, 282 (1993)). Here, however, at least some of the consequences of the district court's error are crystalline. In late April 2014, Proge went to trial represented by an attorney who had told him, and the district court, that she was unprepared to defend Proge. He was prosecuted by an Assistant United States Attorney who twice implored the district court to allow Proge to change attorneys. And he was tried by a district judge who responded to Proge's plaintive requests to substitute counsel by declaring his belief that Proge was trying to game the system.

The district court's denial of Proge's request to substitute counsel vitiated a core protection of the Sixth Amendment. That was an abuse of discretion, and I thus join the majority in vacating Proge's conviction.

## II. RIGHT TO SELF-REPRESENTATION

"The right to appear *pro se* exists to affirm the dignity and autonomy of the accused and to allow the presentation of what may, at least occasionally, be the accused's best possible defense." *McKaskle v. Wiggins*, 465 U.S. 168, 176–77 (1984). "[D]enial of the *Faretta* right is a structural error for which [a defendant] need not show any prejudice." *Washington v. Renico*, 455 F.3d 722, 734 (6th Cir. 2006). Just so here. Powell validly waived his right to counsel. The district court nonetheless refused to allow Powell to represent himself: it first denied Powell's *Faretta* motion after applying the wrong legal standard, then refused to reconsider that denial when the *government* argued that the district court had erred. Because the district court should have granted Powell's motion to proceed pro se, I would vacate Powell's conviction.

At the outset, I note that our "jurisprudence concerning the standard of review applicable to claims asserting violations of the right to self-representation is confused." *United States v. Evans*, 559 F. App'x 475, 478 (6th Cir. 2014); *compare United States v. Jones*, 489 F.3d 243, 247 (6th Cir. 2007) (de novo) *with United States v. Bowker*, 372 F.3d 365, 385 (6th Cir. 2004) (abuse of discretion), *vacated on other grounds by Bowker v. United States*, 125 S. Ct. 1420

(2005). This question remains open in our circuit. *See United States v. Williams*, 641 F.3d 758, 766 (6th Cir. 2011). Even if we were to review for an abuse of discretion the district court's denial of Powell's *Faretta* motion, as the government recommends, I would still reverse.

*Faretta* set an important limitation on the right to self-representation: "[I]n order to represent himself, the accused must knowingly and intelligently forgo" his Sixth Amendment right to counsel. *United States v. Bankston*, 820 F.3d 215, 223 (6th Cir. 2016) (quoting *Faretta v. California*, 422 U.S. 806, 835 (1975)); *see also Martinez v. Court of Appeal of California, Fourth Appellate Dist.*, 528 U.S. 152, 161 (2000) ("[T]he right to self-representation is not absolute. The defendant must voluntarily and intelligently elect to conduct his own defense . . . ." (internal quotation marks and citations omitted)). To this end, "[w]hen an accused wishes to represent himself, the district court must ask the defendant a series of questions drawn from, or substantially similar to, the model inquiry set forth in the *Bench Book for United States District Judges*." *United States v. Ross*, 703 F.3d 856, 867 (6th Cir. 2012) (internal quotation marks omitted).

The purpose of this inquiry is *not* to determine whether a defendant will represent himself as well as an attorney would. Rather, it is to ensure that the defendant is "aware of the dangers and disadvantages of self-representation, so that the record will establish that" his waiver of the right to counsel is knowing and voluntary. *Faretta*, 422 U.S. at 835. Accordingly, "the competence that is required of a defendant seeking to waive his right to counsel is the competence to *waive the right*, not the competence to represent himself." *Godinez v. Moran*, 509 U.S. 389, 399 (1993).

The district court failed to appreciate this distinction. Powell knowingly and intelligently waived his right to counsel. At the Final Pretrial Conference, Powell's attorney informed the district court that Powell wished to proceed pro se. R. 490 (Final Pretrial Conference Tr. at 23) (Page ID #4199). The district court held a hearing on Powell's *Faretta* motion two weeks later, on April 10, 2014. R. 287 (4/10/14 Hr'g Tr.) (Page ID #2174). At that hearing, the district court first informed Powell that in no event would it grant a continuance of Powell's scheduled trial date; Powell said that he understood. *Id.* at 6–7 (Page ID #2179–80). Powell explained that he wished to represent himself so that he could file documents related to the teachings of the

Moorish Science Temple—documents, Powell explained, that his retained attorney was not willing to file. *Id.* at 7–8 (Page ID #2180–81). The district court told Powell that he could be sentenced to life in prison if he were convicted; again, Powell said that he understood. *Id.* at 8–9 (Page ID #2181–82). The district court then asked Powell a series of questions patterned after the *Bench Book*; Powell answered each one by acknowledging that he appreciated fully the court's admonitions about the perils of representing himself at trial. *Id.* at 9–14 (Page ID #2182–87). And when the district court asked Powell if he was voluntarily invoking his *Faretta* right, Powell responded that he was. *Id.* at 15 (Page ID #2188).

Despite Powell's knowing and voluntary waiver of his right to counsel, the district court denied Powell's request, relying on our decisions in *United States v. Sullivan*, 431 F.3d 976 (6th Cir. 2005), and *United States v. Trujillo*, 376 F.3d 593 (6th Cir. 2004). *Id.* at 17–19 (Page ID #2190–92). That was an error: *Sullivan* and *Trujillo* concern the right to counsel of choice, *not* the right to self-representation. *Sullivan*, 431 F.3d at 979; *Trujillo*, 376 F.3d at 606. The government noted this mistake in its motion for reconsideration. R. 263 (4/16/14 Gov't Mot. for Recons. at 4–5) (Page ID #2006–07). Moreover, the government wrote that Powell's *Faretta* motion arguably "satisfied the conditions for self-representation," and it implored the district court to reconsider its denial of that motion. *Id.* at 3, 5–6 (Page ID #2005, 2007–08).

The district court held firm. In an order dated April 23, 2014, the district court justified its denial of Powell's *Faretta* motion largely on the strength of Powell's attorney: "Powell ha[d] been ably represented by [his attorney] for over two years," the district court wrote, and the genesis of Powell's request for self-representation was not his attorney's incompetence but rather Powell's desire to "file additional frivolous documents related to the Moorish Science Temple." R. 286 (4/23/14 Order at 5) (Page ID #2171). Powell, the district court reasoned, was simply trying to delay his trial. *Id.* at 6 (Page ID #2172).

The district court, in other words, did just what *Faretta* and its progeny forbid. The district court reasoned that Powell would probably stand a better chance of prevailing at trial if he were represented by counsel. And the district court reasoned that the documents Powell wished to file were, from a legal standpoint, frivolous. It then denied Powell's *Faretta* motion because it determined that the motion must have been a ruse. Thus, although Powell

demonstrated that he was competent to waive his right to counsel, the district court erroneously denied that right on the assumption that Powell would do a poor job representing himself. *Cf. Godinez*, 509 U.S. at 399.

*Faretta* makes plain that a defendant may waive his right to counsel irrespective of "his technical legal knowledge" or "how well or poorly [the defendant] has mastered the intricacies of" trial procedure. *Faretta*, 422 U.S. at 836. *Faretta* thus teaches that although a defendant "may conduct his own defense ultimately to his own detriment, his choice must be honored out of 'that respect for the individual which is the lifeblood of the law.'" *Id.* at 834 (quoting *Illinois v. Allen*, 397 U.S. 337, 350–51 (1970) (Brennan, J., concurring)). That respect was absent from the district court's denial of Powell's request for self-representation.

Powell's waiver of his right to counsel was both knowing and voluntary. The district court erred by refusing to honor that waiver. And the majority errs in affirming the district court. I would vacate Powell's conviction on the basis of the district court's violation of *Faretta*.